IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

_____

No. 17-0025

_____

FILED

**January 31, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

BILL J. CROUCH, in his capacity as Secretary of the West Virginia Department of
Health and Human Resources,
Defendant Below, Petitioner

v.

ERIC GILLISPIE, Administrator of the Estate of Raynna Rea Boggs,
Plaintiff Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Carrie L. Webster, Judge
Civil Action No. 12-C-697

REVERSED AND REMANDED WITH DIRECTIONS

_____

Submitted: January 9, 2018
Filed: January 31, 2018

Ancil G. Ramey, Esq.                    Charles M. Johnstone, II, Esq.
Hannah C. Ramey, Esq.                   Johnson W. Gabhart, Esq.
Steptoe & Johnson PLLC                  Johnstone & Gabhart, LLP
Huntington, West Virginia               Charleston, West Virginia
Counsel for the Petitioner              Counsel for the Respondent

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.     "A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."  Syllabus Point 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009).

2.     "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court."  Syllabus Point 1, *Findley v. State Farm Mut. Auto Ins. Co.*, 213 W. Va. 80, 576 S.E.2d 807 (2002).

3.     "To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.,* 188 W.Va. 356, 424 S.E.2d 591 (1992).  In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability."  Syllabus Point 11, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

4. "If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby." Syllabus Point 4, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

WALKER, Justice:

Eric Gillispie, administrator of his daughter's estate, filed a wrongful death action against the West Virginia Department of Health and Human Resources (DHHR). Mr. Gillispie contends that DHHR's investigation of allegations made about the care of his daughter was not sufficiently thorough. DHHR contends, among other things, that the circuit court should have granted its motion for summary judgment on the basis of qualified immunity because the complained-of conduct involved discretionary functions and there was no violation of a clearly established statutory or constitutional law. We agree with DHHR's position and reverse the order of the Circuit Court of Kanawha County and remand with instructions to enter summary judgment in favor of DHHR.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 19, 2010, Child Protective Services (CPS) received an anonymous call alleging that Leslie Boggs, who was involved in a dispute with Mr. Gillispie regarding their daughter, Raynna, was unable to care for the child as needed because she was a recovering addict and alcoholic and continued to abuse substances. The anonymous reporter, later identified as Eric Gillispie, also generally alleged that Leslie Boggs's current boyfriend, Andrew Myers, was a convicted felon who had a history of domestic violence issues concerning Leslie but nonetheless was allowed in the home with Raynna. Mr. Gillispie did not allege that Raynna was the subject of any domestic violence. Mr. Gillispie also reported that a fire had broken out in the home while Leslie Boggs was intoxicated. During this call, when asked to identify individuals who could

1

corroborate the allegations, Mr. Gillispie offered no names.  Rather, he stated that the last time he had seen the child she was "fine," and that the child was currently staying with her mother, Leslie, at the home of her grandmother, Donna Boggs.  Mr. Gillispie also identified the caretakers of the child as himself, Leslie Boggs, and Donna Boggs, and he provided Donna Boggs's address.

CPS accepted the referral of Mr. Gillispie's phone call the same day. The Interim Child Protective Services Policy for West Virginia Safety Assessment and Management System Pilot Counties (CPS Guidelines)[1] required the Assessment Worker, Erica Garcia, to make face-to-face contact with Leslie Boggs within 72 hours of the April 19, 2010 report.  Likewise, Ms. Garcia was to consult with her supervisor within 24 hours of the face-to-face visit.  Jenny Pace was immediately assigned as the case supervisor, but was disqualified from serving in that capacity because she knew Eric Gillispie.  Pamela Ingram later replaced Ms. Pace as the case supervisor.

The next day, on April 20, 2010, Ms. Garcia attempted face-to-face contact with Leslie Boggs and Raynna at the home of Donna Boggs.  Ms. Garcia testified that she knocked on Donna Boggs's door and heard people inside the house, then saw two women leaving the house by car.  Ms. Garcia prompted the car to stop, after which she asked if

---

[1] We differentiate the CPS Guidelines relating specifically to safety assessments from the broader CPS policy that governs CPS activities generally.

2

either of the two women were Leslie Boggs. Both denied being Leslie Boggs. Lacking particular information to identify them as the subjects of the referral, Ms. Garcia gave them her card and the two women left. Ninety minutes later, Donna Boggs called Ms. Garcia and told her that they had lied about their identities because they wanted to confirm that she was a CPS worker and not someone attempting to serve papers. During the call, the Boggses set up an interview with Ms. Garcia and another CPS worker, Sarah Flowers, for April 22, 2010. At the April 22, 2010 face-to-face interview, Ms. Garcia and Ms. Flowers completed a Present Dangers and Family Functioning Assessment (Assessment) to determine, based on certain criteria outlined by CPS Guidelines,[2] whether Raynna was in present or imminent danger. As Ms. Garcia testified, upon a finding of present or imminent danger based on the guidelines, the CPS worker must remain in the home with the child until alternate caretakers are arranged.

---

[2] CPS Guidelines provide that the following conditions are "present dangers" to a child: (1) The child is being maltreated at the point of contact during the assessment process; (2) The child has multiple or different kinds of injuries that are non-accidental; (3) The child has injuries to the face or head; (4) Serious injuries are identified in a report and/or evident at the point of contact during the assessment; (5) The maltreatment of several victims is suspected; (6) The maltreatment appears to be premeditated; (7) Life threatening living arrangements are present; (8) Unexplained injuries; (9) The maltreatment demonstrates bizarre cruelty; (10) Caregiver is intoxicated (alcohol or other drugs) at the time of assessment such that the caregiver is unable to provide for his/her child right now due to his/her level of intoxication; (11) Caregiver is out of control (mental illness or other significant lack of control); (12) Caregiver is acting dangerous now or is described as dangerous or aggressive; (13) Caregiver is unable or unwilling to perform basic care; (14) Caregiver overtly rejects intervention; (15) Spouse abuse present and continuously occurring; and (16) Family will flee.

During the completion of the Assessment, Ms. Garcia and Ms. Flowers interviewed Leslie and Donna Boggs separately. Because Leslie indicated that she would be living with her mother for some time, the CPS workers interviewed them both and observed their care of Raynna, as well as that of J.B.,[3] Leslie's older son, who also lived in the home. Ms. Garcia and Ms. Flowers reported that Donna Boggs had been J.B.'s caretaker for many years, and appeared to be very protective of him. They additionally concluded that Donna enhanced the protection of Raynna because it appeared that Donna understood the importance of putting J.B.'s needs before her own and provided a loving and nurturing environment. Leslie reportedly had abdicated all responsibility for parenting J.B. in favor of her mother and had more of a sibling relationship with him. They reported that Leslie attended to Raynna during the visit, acted appropriately with her and had the basic knowledge of how to care for her.

As to reports of drug and alcohol abuse, Leslie denied abusing any substances. She stated that she only drank socially and not while her children were present. Donna likewise reported that Leslie did not abuse drugs or alcohol, and the CPS workers did not find any evidence of alcohol or drug abuse during the home visit. Leslie admitted that she had had some domestic violence issues in the past with J.B.'s father. She also reported to Ms. Garcia that she currently had a restraining order and domestic

---

[3] Consistent with the parties' use below, we refer to Raynna's half-sibling by his initials.

violence petition against Mr. Gillispie because he had threatened her and had set her apartment on fire. The domestic violence petitions were confirmed by the CPS workers. Based on Ms. Garcia's and Ms. Flowers's interviews and observations in the face-to-face interview, as well as the context of Mr. Gillispie and Leslie's apparently volatile relationship, Ms. Garcia determined that none of the present danger conditions existed to justify removing Raynna from the home at that time.

CPS policy establishes a thirty-day window from the time it accepts a referral to complete a family functioning assessment to determine whether to open a case for ongoing CPS intervention. To aid in CPS's investigation, the Boggses gave the CPS workers the names and contact information for Noble Young and Mary Ellis, a church friend and cousin, respectively, who could speak to the Boggses' home situation. CPS Guidelines refer to such individuals as "collaterals," meaning that they are "[a] third party (e.g., friends, neighbors, relatives, or professionals) with information about the alleged abuse/neglect and risk of serious harm to the children."

The day following the face-to-face interview, April 23, 2010, Ms. Garcia unsuccessfully attempted to contact both of the collaterals offered by the Boggses and left messages for them. That same day Ms. Garcia also called Mr. Gillispie and informed him of the face-to-face visit with the Boggses. Mr. Gillispie again did not provide

contact information for any collaterals able to corroborate his allegations regarding Leslie Boggs's parenting abilities or substance abuse.

On May 6, 2010, Ms. Garcia met with her supervisor, Ms. Ingram, to report on the face-to-face visit and her conclusion that no present danger existed. Ms. Ingram concurred in Ms. Garcia's findings that no present danger existed. Ms. Garcia continued the investigation into whether continued CPS intervention was necessary. Before the conclusion of the thirty-day investigative window, however, Ms. Garcia received information that Raynna had died under suspicious circumstances on May 10, 2010. Leslie Boggs is currently incarcerated for the death of Raynna that apparently resulted from Ms. Boggs rolling onto Raynna while sleeping after having consumed alcohol.

Mr. Gillispie, as administrator of Raynna's estate, filed this wrongful death suit, alleging that DHHR's investigation was not sufficiently thorough and resulted in the death of Raynna. DHHR moved for summary judgment arguing that Mr. Gillispie's claims sounded in negligence for failure to thoroughly investigate Mr. Gillispie's allegations against Leslie Boggs prior to the death of Raynna. DHHR argued that because DHHR has discretion in the performance of its investigations, even if performed negligently, it is entitled to qualified immunity. DHHR also raised statutory immunity

pursuant to West Virginia Code § 49-2-802(h),[4] which provides that "[n]o child protective services caseworker may be held personally liable for any professional decision or action taken pursuant to that decision in the performance of his or her official duties as set forth in this section or agency rules promulgated thereupon."  Conversely, Mr. Gillispie argued that DHHR had a duty to conduct a thorough investigation and had violated certain requirements contained in CPS Guidelines.

The circuit court examined the factual circumstances in light of the CPS Guidelines and determined that

> [t]here is no question that the CPS policy gives workers substantial discretion when they conduct investigations . . . [a]nd ultimately, the CPS worker and supervisor will make a decision at the end of the investigation as to whether the case should be closed or further action should be taken.  These decisions and actions fall within the CPS workers' discretionary functions and they have qualified immunity against any alleged negligence in their exercise of the same.

However, when viewing the CPS Guidelines in conjunction with the statutory mandate[5] that CPS investigations be sufficiently thorough, the circuit court determined that DHHR

---

[4] W. Va. Code § 49-2-802(h) was added in the recodification of the *Child Welfare Act* in 2015.

[5] W. Va. Code § 49-6A-9(b)(3), recodified in 2015 as W. Va. Code § 49-2-802(c)(3), provides that each local protective service office shall perform the following duties:

(continued . . .)

7

was not entitled to qualified immunity. Through this lens, the circuit court concluded that the CPS Guidelines were adopted by DHHR to implement the statutory requirement for a thorough investigation and therefore had the full force and effect of law. Thus, despite finding that DHHR has discretion in conducting their investigations, the circuit court nonetheless determined that DHHR was not entitled to qualified immunity because it was alleged that it had violated a clearly established statutory or constitutional law. The circuit court denied DHHR's motion for summary judgment and this appeal followed.

## II. STANDARD OF REVIEW

In qualified immunity cases, we have held that "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."[6] Likewise, "[t]his Court reviews *de novo* the denial of a motion for summary judgment, where such ruling is properly reviewable by this Court."[7]

---

Upon notification of suspected child abuse or neglect, commence or cause to be commenced a thorough investigation of the report and the child's environment. As part of this process, within fourteen days there shall be a face-to-face interview with the child or children and the development of a protection plan, if necessary for the safety and health of the child, which may involve law-enforcement officers or the court[.]

[6] Syl. Pt. 2, *Robinson v. Pack*, 223 W. Va. 828, 679 S.E.2d 660 (2009).

[7] Syl. Pt. 1, *Findley v. State Farm Mut. Auto Ins. Co.*, 213 W. Va. 80, 576 S.E.2d 807 (2002).

8

## III. ANALYSIS

DHHR alleges the circuit court erred in determining that it was not entitled to qualified immunity even though the circuit court also found that DHHR was vested with discretion in the conduct of its investigations. In furtherance of that argument, DHHR contests the circuit court's determinations that interim CPS Guidelines qualify as a clearly established statutory or constitutional law, and that Mr. Gillispie had demonstrated a violation of those guidelines. In contrast, Mr. Gillispie argues that the CPS Guidelines were promulgated by DHHR in response to the statutory directive that CPS conduct a thorough investigation and therefore have the full force and effect of law.

Qualified immunity, as we have discussed, "is broad and protects 'all but the plainly incompetent or those who knowingly violate the law.'"[8] Further, "[a] public officer is entitled to qualified immunity for discretionary acts, even if committed negligently."[9] In light of these standards, qualified immunity determinations often center upon whether a decision was discretionary or nondiscretionary. Here, however, the

---

[8] *W. Va. State Police v. Hughes*, 238 W. Va. 406, 411, 796 S.E.2d 193, 198 (2017) (quoting *Hutchison v. City of Huntington*, 198 W. Va. 139, 148, 479 S.E.2d 649, 658 (1996)).

[9] *Maston v. Wagner*, 236 W. Va. 488, 500, 781 S.E.2d 936, 948 (2015).

9

circuit court concluded and there is no dispute that the investigative process of DHHR in child abuse and neglect proceedings requires the exercise of discretion.  Consequently, at issue is the determination that DHHR was nonetheless stripped of qualified immunity because Mr. Gillispie demonstrated that a clearly established statutory or constitutional law had been violated.  Indeed, as we have discussed,

> [t]o the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.,* 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.[10]

More specifically, we are asked to determine whether the CPS Guidelines rise to the level of a clearly established statutory or constitutional right, and, if so, whether Mr. Gillispie has demonstrated acts or omissions in violation of the CPS Guidelines.

Of course, "the question of whether the constitutional or statutory right was clearly established is one of law for the court."[11]  The issue, we have recognized, is whether "it would be clear to a reasonable officer that his conduct was unlawful in the

---

[10] Syl. Pt. 11, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014) (footnote added).

[11] *Hutchison,* 198 W.Va. at 149, 479 S.E.2d at 659.

situation he confronted."[12] Expounding on that criteria, we have explained that specificity is required:

> To prove that a clearly established right has been infringed upon, a plaintiff must do more than allege that an abstract right has been violated. Instead, the plaintiff must make a "particularized showing" that a "reasonable official would understand that what he is doing violated that right" or that "in the light of preexisting law the unlawfulness" of the action was "apparent."[13]

Here, Mr. Gillispie alleges that certain time frames and directives contained in the CPS Guidelines were not met, and the failure to meet those CPS Guidelines constitutes a violation of a clearly established statutory or constitutional law for which DHHR is not afforded qualified immunity. In particular, Mr. Gillispie alleges three breaches of CPS Guidelines. First, he alleges that Ms. Garcia did not make face-to-face contact within twenty-four hours of an accepted referral. Second, he alleges that Ms. Garcia did not contact a sufficient number of collaterals, and, third, that Ms. Garcia did not communicate with a supervisor within twenty-four hours of the face-to-face home visit. In addition to arguing that the CPS Guidelines were interim and did not rise to the level of a clearly established statutory or constitutional law, DHHR likewise argues that Ms. Garcia did not, in fact, violate any of the CPS Guidelines.

---

[12] *City of Saint Albans v. Botkins,* 228 W. Va. 393, 400, 719 S.E.2d 863, 870 (2011) (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)).

[13] *Hutchison,* 198 W. Va. at 149 n. 11, 479 S.E.2d at 659 n. 11 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)) (footnote added).

11

The circuit court determined that the CPS Guidelines in effect in Kanawha County at the time of the investigation, despite their interim nature, had the full force and effect of law because "[t]he Social Service Manual [was] incorporated by reference as a legislative rule by W. Va. C.S.R. § 78-5-2 (eff. July 1, 1986)." Although the Social Service Manual may have been incorporated by reference by that state regulation in 1986, the CPS Guidelines in effect at the operative time had been revised in 2009, were revised again in 2010, and have not been adopted or approved by the Legislature. Moreover, the CPS Guidelines are interim rules and even so are not uniformly applied across the state— they are applicable only in pilot counties. Under these circumstances, we have difficulty elevating those interim guidelines to a clearly established statutory or constitutional law; the issue is compounded by Mr. Gillispie's failure to demonstrate that clearly established CPS Guidelines were violated, that Ms. Garcia would have known she was violating a clearly established right or that the specific alleged failures were even remotely causally related to Raynna's death.

Initially, we dispose of the allegation that Ms. Garcia violated the CPS Guidelines by not making face-to-face contact within twenty-four hours of accepting a referral. CPS Guidelines allow a response time of seventy-two hours, which may be abbreviated if deemed necessary by the supervisor. The intake sheet provides for a seventy-two hour response time, but also intimates that the supervisor may have suggested a twenty-four hour response time. The testimony elicited by attorneys in Ms.

12

Garcia's deposition did little to clarify that matter, but the response time, in this case, is of no moment—Ms. Garcia attempted face-to-face contact within twenty-four hours and met with the Boggses within the seventy-two hour window. It is particularly inconsequential because even if a twenty-four-hour response time was imposed by the intake supervisor, Mr. Gillispie has not even alleged, much less demonstrated, that the investigation was in any way impacted by a forty-eight-hour lag in response time.

Second, as to the failure to contact sufficient collaterals, CPS guidelines provide that "[t]he CPS Social Worker must interview as many collaterals as needed to reach conclusions regarding the alleged abuse/neglect and threat of serious harm." This directive is riddled with discretion and can be likened to the circumstances we considered in *Hughes*, in which we explained that investigation of a crime scene is discretionary: "Second, as to the November Troopers' search of the quarry, the plaintiffs have not directed us to any constitutional provision, statute, case, regulation, or any other law governing the length of time or the method by which a State Police trooper must search a potential crime scene."[14] Here, as in *Hughes*, there is no specific method that a CPS worker must use to investigate a home situation—there is no directive for the length or timing of interviewing collaterals, or the lengths to which CPS workers must go to identify additional collaterals or locate collaterals for which they have no contact

---

[14] *Hughes*, 238 W. Va. at 414, 796 S.E.2d at 201.

13

information.  Further, Ms. Garcia attempted to contact all of the collaterals for which she was given contact information.  Notably, Mr. Gillispie did not provide any collaterals to corroborate his allegations.  Of the collaterals Ms. Garcia contacted, none expressed concern that the Boggses were incapable of adequately caring for Raynna, and Ms. Garcia herself observed no concerns that would have necessitated removing Raynna from the home.  More importantly, Mr. Gillispie has not alleged which collaterals, if any, would have provided any information that would have influenced Ms. Garcia to make a finding of present danger so as to immediately remove Raynna from the home.

It is important to recognize that the investigation was still ongoing at the time of Raynna's death.  Ms. Garcia still had several weeks during which to determine whether to open a case for ongoing CPS intervention.  For that reason, Mr. Gillispie's challenge to the investigation is, in actuality, a challenge to Ms. Garcia's failure to make a finding of present danger requiring her to remove Raynna from Donna Boggs's home at the time of the face-to-face interview.   The challenges facing a CPS worker in making the determination of whether or not a situation of present danger exists and, so, whether to remove a child from a home, strikes at the heart of qualified immunity:

> If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or

14

other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.[15]

Qualified immunity is "justified and defined by the *functions* it protects and serves, not by the person to whom it attaches."[16] We have further explained that "[t]he purpose of such official immunity is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation. The provision of immunity rests on the view that the threat of liability will make officials unduly timid in carrying out their official duties."[17] As we have discussed in the context of police investigations, "[a] policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does."[18] Likewise, had Ms. Garcia removed Raynna from the home without sufficient evidence to do so, she and DHHR were equally exposed to litigation. Accordingly, Ms. Garcia's investigation into collaterals was discretionary,

---

[15] Syl. Pt. 4, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995) (footnote added).

[16] *A.B.*, 234 W. Va. at 507–08, 766 S.E.2d 751, 766–67 (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)).

[17] *W. Va. Dep't of Health & Human Res. v. Payne*, 231 W. Va. 563, 577, 746 S.E.2d 554, 568 (2013) (quoting *Westfall v. Erwin,* 484 U.S. 292, 295 (1988)) (cleaned up).

[18] Syl. Pt. 1, in part, *Bennett v. Coffman*, 178 W. Va. 500, 361 S.E.2d 465 (1987). *See also State v. Chase Sec., Inc.*, 188 W. Va. 356, 361 n.14, 424 S.E.2d 591, 596 n.14 (1992) (clarifying holding in *Bennett* as applicable only in qualified immunity cases).

15

and we do not find her investigation was in violation of the CPS Guidelines such that DHHR is stripped of qualified immunity.

Finally, Mr. Gillispie alleges that Ms. Garcia violated the CPS Guidelines by failing to contact her supervisor within twenty-four hours. Under the CPS Guidelines a CPS worker must "[c]onsult with the CPS Social Worker Supervisor within 24 hours of contact with the identified child unless a present danger is identified." While Ms. Garcia admits that she did not have contact with her supervisor within twenty-four hours of the face-to-face visit, her admission is not without qualification—at the time, she was unable to contact her supervisor because her initial supervisor had a conflict of interest and another supervisor had to replace her. While a replacement supervisor could have been assigned sooner, the crux of a qualified immunity determination is whether a reasonable CPS worker would have known that she was violating a clearly established statutory or constitutional right. As we discussed above, the relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[19] Given the circumstances described by Ms. Garcia, we conclude that a reasonable CPS worker would not be aware that her conduct was unlawful when confronted with a situation in which her original supervisor had a conflict and for that reason alone did not meet the twenty-four-hour requisite time period. Ultimately,

---

[19] *See supra* note 12.

however, it is a moot point. Prior to the death of Raynna, the new supervisor, Ms. Ingram, agreed with Ms. Garcia's assessment that no present dangers to Raynna existed and that, therefore, there was no cause to remove Raynna from the home at that time. In the end, in this particular case, whether Ms. Ingram reviewed Ms. Garcia's assessment immediately or on May 6, 2010, it had no impact on the investigation whatsoever.

Even were we to find that the CPS Guidelines in this case rose to the level of a clearly established statutory or constitutional right, Mr. Gillispie has neither alleged nor demonstrated how the alleged violations, if credible, had any causal relation to the death of Raynna such that DHHR could be held responsible for an insufficient investigation. As this Court explained in *State v. Chase Securities, Inc.*,

> the thrust of any attempt to establish liability against a public official is the violation of some duty attendant to the official's office and a resulting harm to the plaintiff. This analysis essentially adopts the common law tort concept that liability results from the violation of a duty owed *which was a proximate cause of the plaintiff's injury*.[20]

We are wary of allowing a party to overcome qualified immunity by cherry-picking a violation of any internal guideline irrespective of whether the alleged violation bears any causal relation to the ultimate injury. Therefore, in the absence of allegations tying the alleged violations to Raynna's death, we are unable to view this case

---

[20] 188 W. Va. at 364, 424 S.E.2d at 599 (emphasis added).

17

as more than an abstract assertion that DHHR could have investigated more thoroughly.[21]

Although we are struck by the resoundingly devastating facts of this case, we are bound to faithfully apply the law. And, as we have discussed in two previous cases, skeletal assertions are insufficient to strip DHHR of qualified immunity:

> Also, like *Payne,* in discovery, respondent made the skeletal assertion that if D.H. were properly trained and supervised, the rape would not have occurred. This illusory and languid contention is no more sufficient to overcome the State's immunity in this case than in *Payne:* "Respondents seem to argue simply that if the DHHR defendants were doing their job properly, this incident would not have occurred. . . . Although this overly simplistic analysis may be appealing in light of these tragic events, qualified immunity insulates the State and its agencies from liability based on vague or principled notions [of government responsibility]."[22]

---

[21] *See, e.g.*, *Simley v. City of Ferndale*, No. 97-1858, 1999 WL 196504, at *4 (6th Cir. January 13, 1999) ("This leads us to Mr. Simley's main argument: that the arresting officers are not entitled to qualified immunity because they should have performed a more thorough investigation. Our task, however, is not to determine whether the officers could have done a better job of investigating. We need only determine whether the arresting officers' conclusion was reasonable, albeit mistaken. . . . Having concluded that a reasonable officer could have believed that there was probable cause to arrest, we need go no further. The entry of summary judgment in favor of the arresting officers was proper.").

[22] *A.B.*, 234 W. Va. at 516 n.33, 766 S.E.2d at 775 n.33 (citing *Payne*, 231 W. Va. at 574, 746 S.E.2d at 565).

Raynna's tragic death perhaps epitomizes this temptation, but we find that Mr. Gillispie has failed to demonstrate a violation of a clearly established statutory or constitutional law sufficient to strip DHHR of its qualified immunity.[23]

## IV.  CONCLUSION

For the foregoing reasons, we reverse the order of the Circuit Court of Kanawha County denying DHHR's motion for summary judgment and remand for the entry of an order granting DHHR's motion for summary judgment and dismissing the action against it.

Reversed and Remanded with Directions.

---

[23] Because we have concluded that DHHR is entitled to qualified immunity, we need not address DHHR's contention that it is likewise entitled to statutory immunity pursuant to W. Va. Code § 49-2-802(h).