# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Jerry Markham,**
**Administratrix of the Estate of Selwyn Vanderpool,**
**and Joseph W. Boswell, III,**
**Plaintiffs Below, Petitioners**

**vs.) No. 19-0163** (Greenbrier County 16-C-33B)

**West Virginia Department of Health and**
**Human Resources and Drema Stanley,**
**Defendants Below, Respondents**

**FILED**
**May 26, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioners Jerry Markham, Administratrix of the Estate of Selwyn Vanderpool, and Joseph W. Boswell, III, appeal the circuit court's January 14, 2019, order granting summary judgement in favor of Respondents West Virginia Department of Health and Human Resources ("DHHR") and Drema Stanley ("Ms. Stanley").[1] The circuit court's order granting summary judgment in favor of Respondents provided that "plaintiffs have failed to clearly establish any constitutional or statutory violations, nor any fraudulent, malicious or oppressive conduct on [the] part of the defendants. As such, plaintiffs cannot defeat either defendant's entitlement to qualified immunity as a matter of law." On appeal, Petitioners contend that the circuit court erred in ruling that 1) "Petitioners could not recover from Respondent DHHR up to the limits of applicable insurance proceeds," and 2) Respondents are entitled to qualified immunity.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the circuit court is appropriate under Rule 21 of the Rules of Appellate Procedure.

---

[1] Respondents are represented by Jace H. Goins, Esq., and Michelle E. Gaston, Esq. Petitioners are represented by Barry L. Bruce, Esq.

1

Selwyn Vanderpool ("Mr. Vanderpool") and Joseph W. Boswell, III ("Mr. Boswell"), filed their complaint on February 19, 2016, against Respondents, DHHR and Ms. Stanley, a DHHR Adult Protective Services counselor. According to Mr. Boswell, he met Mr. Vanderpool in 2006. Mr. Boswell, who was 28 years old in 2006, owned a used automobile lot and a sporting goods store. He sold Mr. Vanderpool, who was 84 years old in 2006, a pickup truck. Mr. Boswell became close friends with Mr. Vanderpool and his wife, Lila Vanderpool, after this initial meeting. Thereafter, Mrs. Vanderpool sustained injuries from a fall and was placed in Brier Center, a nursing home in Greenbrier County.[2]

Mrs. Vanderpool was completely bedridden during the time she was in the nursing home. She was declared mentally incompetent on November 29, 2013. According to the complaint, the nursing home expenses were "very costly," and Mr. Vanderpool inquired as to what social services were available to help defray the costs. The complaint provides that Mr. Vanderpool "was advised by the Brier Center that he had too many assets in his and his wife's names, and he should do something about moving his assets out of their names. The Vanderpools approached Boswell and requested he allow them to transfer assets to Boswell."

On January 22, 2014, the DHHR received a referral concerning the possible financial exploitation of Mrs. Vanderpool. The DHHR assigned this matter to Ms. Stanley. Her investigation included interviews with Mr. Vanderpool, Mrs. Vanderpool, Mr. Boswell, nursing home employees, and employees of two banks. During the investigation, Mr. Vanderpool provided Ms. Stanley with a written release authorizing her to access his bank records and to conduct a deed and title search to determine whether any of the Vanderpools' property had been conveyed, transferred or sold. The investigation uncovered numerous instances in which bank accounts and real estate had been transferred from the Vanderpools to Mr. Boswell individually or to his company, Cornerstone Marketing, LLC.

In one such instance, it was determined that Mr. Boswell called Sun Life Bank, told them he was Mrs. Vanderpool's son, and cashed out a retirement account in Mrs. Vanderpool's name. The amount of the account was $121,646.20. The bank had recordings of phone calls Mr. Boswell made to it regarding this account. When asked during his deposition whether he had held himself out as Mrs. Vanderpool's son when speaking to the bank, Mr. Boswell replied:

> Here's what I said when they asked me who I was. I said, my
> name's Joey Boswell or Joseph Boswell. . . . So, obviously,
> right there Sun Life would know that I'm not a Vanderpool,
> but the relationship had grown really, really strong with Lila

---

[2] It is unclear the exact date when Mrs. Vanderpool entered the nursing home.

and myself. She treated me as if I was her son and I do recall at some point, you know, after Lila had given all the information, you know, Social, birthday, address. She had to go through a, I would say a dissertation, you know, when you're dealing with that type of situation. *I do recall stating I was her son*, but no – you know, obviously they knew Joey Boswell was not her son, but now they treated me as a son. She was like a mother role or grandmother role to me, so that's what I did.

Q.     And, eventually, I'll just cut to the chase, the money in Lila's retirement account was cashed out, correct?

A.     It was.

Q.     And a check, I believe, was sent to – was it sent to Lila Vanderpool, made payable to her from Sun Life for $121,000?

A.     The best I recall, it was sent to Lila Vanderpool at her home.

Q.     And eventually that money made its way into the Cornerstone Marketing (Boswell's business) bank account. Correct?

A.     Correct.

(Emphasis added).

As a result of her investigation, Ms. Stanley referred the matter to law enforcement.  On January 31, 2014, the Greenbrier County Sheriff's Department opened a criminal investigation into Mr. Boswell.  According to State Trooper William Pendleton, who investigated this matter, the criminal investigation substantiated the allegations that Ms. Stanley had relayed—that Mr. Boswell was financially exploiting Mrs. Vanderpool. Trooper Pendleton set forth numerous instances of potential financial exploitation, including a deed of trust to a farm being signed over to Mr. Boswell's business, Cornerstone Marketing:

> During the course of our investigation, we found that – that Mr. Boswell had taken one of his family members, a notary public, into the nursing home to sign over the [Vanderpool owned] farm into Cornerstone Marketing's name. And Mr. Vanderpool was present. But we did not believe at the time that we were

3

doing this that Mr. Vanderpool had the capacity to sign over her [Mrs. Vanderpool's] interest in the farm to Cornerstone Marketing.

A criminal complaint was filed against Mr. Boswell on February 7, 2014, for the felony charge of "unlawfully, intentionally, and feloniously misappropriating or misusing the funds or assets of an elderly person . . . namely, Lila Vanderpool." Trooper Pendleton stated that Ms. Stanley did not make the decision to file criminal charges against Mr. Boswell, rather, that decision was made by law enforcement and by the prosecutor's office.[3] When asked about Ms. Stanley's handling of this matter, Trooper Pendleton stated that her actions were "extremely appropriate." When asked whether the DHHR had reason to investigate financial exploitation in this matter, Trooper Pendleton testified, "yes, emphatically yes." Finally, Trooper Pendleton referred to this matter as a "textbook case . . . [of] financial exploitation of the elderly."

The criminal charge against Mr. Boswell was eventually dropped due to Mrs. Vanderpool passing away and Mr. Vanderpool's reluctance to cooperate with law enforcement. Regarding Mr. Vanderpool's reluctance to pursue this matter—Mr. Vanderpool initially cooperated with the DHHR's investigation. According to a report from Ms. Stanley, Mr. Vanderpool stated that "Mr. Boswell harassed him into signing his wife's medical and power of attorney over to him." However, shortly after the sheriff's department began their investigation, they attempted to interview Mr. Vanderpool but he advised them that he was not going to speak with them and that he was being represented by attorney Barry Bruce, the same attorney who represented Mr. Boswell. Further, law enforcement discovered that Mr. Bruce created a trust and that all of the property and bank accounts that had previously been transferred from the Vanderpools to Mr. Boswell was placed in this trust. As noted by Trooper Pendleton during his deposition, "the trust wasn't created until the investigation [of financial exploitation of Mrs. Vanderpool] began." According to Mr. Boswell's testimony, all of the items in this trust eventually went to Mr. Boswell after Mr. and Mrs. Vanderpool died.

---

[3] Petitioners filed a separate lawsuit arising out of this investigation against the sheriff's department and an individual employee of the sheriff's department alleging that they were negligent in obtaining and serving a subpoena for Petitioners' bank records, resulting in the disclosure of confidential financial information. The sheriff's department and the individual employee filed a motion to dismiss this lawsuit. The circuit court granted defendants' motion to dismiss, and Petitioners appealed to this Court. This Court affirmed the dismissal in *Vanderpool v. Hunt*, 241 W. Va. 254, 823 S.E.2d 526 (2019).

4

In February of 2016, Mr. Boswell and Mr. Vanderpool, who was 92 years old at the time, filed the complaint in the instant case against the DHHR and Ms. Stanley.[4] The two counts set forth in the complaint are as follows:

> Count I. Defendant Stanley was grossly negligent in her investigation of plaintiffs' APS case and acted in a wilful [sic] and wanton manner ignoring West Virginia Code 9-6-1, et seq, and Social Services Manual/Adult Services Policy[.]

> Count II. The manager and supervisors of the Greenbrier Field Office of DHHR were grossly negligent and acted in a wilful [sic] and wanton manner regarding the rights and dignity of the plaintiffs in not supervising the APS workers at said facility to abide and follow statutory and regulatory requirements regarding APS[.]

The complaint alleged that Ms. Stanley's "wrongful and unsubstantiated actions directly resulted in [Mr. Boswell's] loss of $370,000 (a sum certain) plus thousands of dollars in lost sales based on previous monthly income." Further, the complaint alleged that Mr. Boswell suffered loss of his business reputation and that Mr. Vanderpool suffered intentional infliction of emotional distress based on the DHHR's investigation. The complaint also provides that "[t]he Plaintiffs in this case are seeking no recovery from State funds, but only recovery up to the limits of Defendants, DHHR's and Stanley's, State and/or personal liability coverages."

Ms. Stanley and the DHHR filed a motion for summary judgment on July 24, 2017. Following a hearing, the circuit court entered an order granting the motion for summary judgment on January 14, 2019. The circuit court concluded that "plaintiffs have failed to clearly establish any constitutional or statutory violations, nor any fraudulent, malicious or oppressive conduct on [the] part of the defendants. As such, plaintiffs cannot defeat either defendant's entitlement to qualified immunity as a matter of law." After entry of the circuit court's order, Petitioners filed the instant appeal.

This Court has previously held that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

---

[4] Mr. Vanderpool died in July 2017. Jerry Markham, the Administratrix of Mr. Vanderpool's estate, was substituted as the named plaintiff.

On appeal, Petitioners raise two assignments of error. First, Petitioners assert that the circuit court erred in ruling that "Petitioners could not recover from Respondent DHHR up to the limits of applicable insurance proceeds." Second, Petitioners contend that

> the circuit court . . . committed reversible error in ruling that there were no issues of material fact and that Respondents were entitled to summary judgment as a matter of law on the erroneous basis that Petitioners failed to clearly establish any constitutional or statutory violations, nor any fraudulent, malicious or oppressive conduct on [the] part of Respondents.

We address each argument in turn.

Petitioners first argue that the circuit court erred in ruling that "Petitioners could not recover from Respondent DHHR up to the limits of applicable insurance proceeds." According to Petitioners, they may recover up to the limits of the DHHR's insurance "proceeds" pursuant to *Shaffer v. Stanley*, 215 W. Va. 58, 593 S.E.2d 629 (2003). In syllabus points eight and nine of *Shaffer*, this Court held:

> 8. "Suits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." Syllabus Point 2, *Pittsburgh Elevator v. W.Va. Bd. of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983).

> 9. "W.Va. Code, 29-12-5(a) (1986), provides an exception for the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution. It requires the State Board of Risk and Insurance Management to purchase or contract for insurance and requires that such insurance policy shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits." Syllabus Point 1, *Eggleston v. W.Va. Dept. of Highways*, 189 W.Va. 230, 429 S.E.2d 636 (1993).

Petitioners argue that because they are only seeking recovery under Respondents' insurance policies, Respondents are not entitled to qualified immunity. According to Petitioners, the circuit court's "unconscionable failure to acknowledge *Shaffer* and its concomitant failure to apply the proper controlling authority herein clearly constitutes grounds for reversal."

6

Conversely, Respondents argue that Petitioners' reliance on *Shaffer* is "wholly misplaced as that decision pertains to *sovereign immunity not qualified immunity*." (Emphasis added). We agree.

In syllabus point two of *W. Va. Bd. of Educ. v. Marple*, 236 W. Va. 654, 783 S.E.2d 75 (2015), this Court held:

> The state insurance policy exception to sovereign immunity, created by West Virginia Code § 29-12-5(a)(4) [2006] and recognized in Syllabus Point 2 of *Pittsburgh Elevator Co. v. W.Va. Bd. of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), applies only to immunity under the West Virginia Constitution and does not extend to qualified immunity. *To waive the qualified immunity of a state agency or its official, the insurance policy must do so expressly*, in accordance with Syllabus Point 5 of *Parkulo v. W.Va. Bd. of Probation & Parole*, 199 W.Va. 161, 483 S.E.2d 507 (1996).

(Emphasis added).

This Court explained in *Marple* that "[t]he fact that a plaintiff seeks recovery against a state agency and/or its official 'under and up to the limits' of its liability insurance policy does not waive qualified immunity. Rather, qualified immunity is waived by an insurance policy only if the policy's terms expressly say so." *Id.* at 662, 783 S.E.2d at 83. In the present case, there is no evidence demonstrating that Respondents' insurance policies include an express waiver of qualified immunity. Therefore, we agree with the circuit court's ruling. Under this Court's clear holding in *Marple*, Petitioners first assignment of error fails.

Petitioners' next assignment of error provides that the circuit court erred in granting summary judgment on the basis that Respondents are entitled to qualified immunity. Specifically, Petitioners assert that the circuit court erred by concluding that there are no issues of material fact and that Petitioners failed to clearly establish any constitutional or statutory violations, nor any fraudulent, malicious or oppressive conduct on the part of Respondents.

This issue requires us to examine our qualified immunity jurisprudence. In *Crouch v. Gillispie*, 240 W. Va. 229, 809 S.E.2d 699 (2018), this Court noted that

> [q]ualified immunity is broad and protects all but the plainly incompetent or those who knowingly violate the law. Further, a public officer is entitled to qualified immunity for discretionary acts, even if committed negligently. In light of

7

these standards, qualified immunity determinations often center upon whether a decision was discretionary or nondiscretionary.

*Id.* at 234, 809 S.E.2d at 704 (Internal citation and quotation omitted).

Further,

[t]o the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.,* 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

Syl. Pt. 11, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014).

This Court has also held that

[i]f a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

Syl. Pt. 4, *Clark v. Dunn*, 195 W. Va. 272, 465 S.E.2d 374 (1995).

In the present case, the circuit court noted that the duties and responsibilities of Adult Protective Services are set forth in W. Va. Code § 9-6-2(c):

(c) The secretary shall design and arrange such rules to attain, or move toward the attainment, of the following goals to the extent that the secretary believes feasible under the provisions of this article within the state appropriations and other funds available:

(1) Assisting adults who are abused, neglected, financially exploited or incapacitated in achieving or maintaining self-sufficiency and self-support and preventing, reducing and eliminating their dependency on the state;

(2) Preventing, reducing and eliminating neglect, financial exploitation and abuse of adults who are unable to protect their own interests;

(3) Preventing and reducing institutional care of adults by providing less intensive forms of care, preferably in the home;

(4) Referring and admitting abused, neglected, financially exploited or incapacitated adults to institutional care only where other available services are inappropriate;

(5) Providing services and monitoring to adults in institutions designed to assist adults in returning to community settings;

(6) Preventing, reducing and eliminating the exploitation of incapacitated adults and facility residents through the joint efforts of the various agencies of the Department of Health and Human Resources, the adult protective services system, the state and regional long-term care ombudsmen, administrators of nursing homes or other residential facilities and county prosecutors;

(7) Preventing, reducing and eliminating abuse, neglect, and financial exploitation of residents in nursing homes or facilities; and

(8) Coordinating investigation activities for complaints of financial exploitation, abuse and neglect of incapacitated adults and facility residents among the various agencies of the Department of Health and Human Resources, the adult protective services system, the state and regional long-term care ombudsmen, administrators of nursing homes or other residential facilities, county prosecutors, if necessary, and other state or federal agencies or officials, as appropriate.

The circuit court found that this statute's plain language makes clear that Adult Protective Services "is charged with preventing, reducing, eliminating and investigating the exploitation and abuse and/or neglect of protected persons in this State." Based on this statutory language setting forth the duties and responsibilities of Adult Protective Services, the circuit court determined that the "complained of acts in this case relate to the discretionary government functions" of the DHHR. We agree.

The main violation asserted by Petitioners is that Ms. Stanley failed to provide certain documents to Mr. and Mrs. Vanderpool and to Mr. Boswell during the course of her investigation. Specifically, Petitioners assert that the Adult Protective

9

Services Policy contained in Chapter 1, § 1-14-2(d)(2) and (10) of the Social Services Manual, required Ms. Stanley to provide Mr. and Mrs. Vanderpool with a document entitled "Client Rights During the APS (Adult Protective Service) Process," and to provide Mr. Boswell with a document entitled "Alleged Perpetrator's Rights During the APS Process." Petitioners assert that Ms. Stanley's failure to provide Mr. and Mrs. Vanderpool and Mr. Boswell with the forms required by the Social Services Manual constituted a violation of W. Va. Code § 9-6-2(b).[5]

Conversely, Respondents contend that Petitioners' complaint did not identify any statutory or constitutional provision that was violated. According to Respondents, Petitioners' references to documents that were "required" to be produced by the Social Services Manual are erroneous. They assert that Mr. Vanderpool was not given a victim's rights form because he was not the alleged victim. Further, Mrs. Vanderpool, now deceased, is not a party to this action, and whether she was provided with a particular form is irrelevant. Respondents also assert that Mr. Boswell received the notice that is required to be provided to "the alleged perpetrator."[6]

Respondents also note that assuming arguendo that Petitioners identified a statutory violation, summary judgment was nevertheless appropriate because Petitioners' claims lack the requisite causation, as set forth by this Court in *Crouch*, to overcome qualified immunity. In *Crouch*, the Court examined whether internal DHHR policy violations rose to the level of being violations of a clearly established right. The Court provided:

> [w]e are wary of allowing a party to overcome qualified immunity by cherry-picking a violation of any internal guideline irrespective of whether the alleged violation bears any causal relation to the ultimate injury. Therefore, in the absence of allegations tying the alleged violations to [the]

---

[5] It provides:

> (b) The secretary shall propose rules for legislative approval in accordance with the provisions of § 29A-3-1 *et seq.* of this code regarding the organization and duties of the adult protective services system and the procedures to be used by the department to effectuate the purposes of this article. The rules may be amended and supplemented from time to time.

[6] According to testimony from Ms. Stanley, and her co-worker, the "Alleged Perpetrator's Rights During the APS Process" form was read to Mr. Boswell during the investigation.

death, we are unable to view this case as more than an abstract assertion that DHHR could have investigated more thoroughly.

240 W. Va. at 237, 809 S.E.2d at 707 (Footnote omitted).

We find the instant case analogous to *Crouch*. Even if we concluded that Ms. Stanley's alleged failure to provide Mr. Boswell with a form from the Social Services Manual rose to the level of a clearly established statutory right, we agree with Respondents that the causal connection between the alleged DHHR improprieties and Petitioners' damages simply do not exist. Mr. Boswell's alleged damages include loss of business income as a result of harm done to his business reputation and to his "very lucrative multi-level business." Mr. Boswell asserts that his arrest for financial exploitation of an elderly person and the subsequent media coverage of his arrest were brought about by Respondents. However, Respondents assert that it is clear from Mr. Boswell's own testimony that: 1) his business declined in 2013, the year before the DHHR investigation; 2) his business partners were responsible for the demise of his business by fraudulently terminating him from the business and revoking his "buyout" (Mr. Boswell sued his business partners and asserted that he was fraudulently terminated); 3) the publicity which he blames for damaging his business reputation occurred after his arrest on February 7, 2014, as opposed to any time before the arrest when the DHHR investigation was ongoing; 4) there is no evidence that Respondents leaked information regarding the confidential investigation to the media; 5) arrests are public knowledge and are routinely publicized in the media; and 6) Mr. Boswell's own conduct was the cause of his arrest and any resulting damage to his reputation.

We agree with Respondents' argument and conclude that Petitioners have failed to show any causal relationship between their alleged damages and Ms. Stanley's alleged failure to provide Mr. Boswell with a form from the Social Services Manual. Further, it is undisputed that the decision to arrest Mr. Boswell and charge him with a crime was not made by the DHHR or Ms. Stanley. Rather, this action was taken by the sheriff's department and the prosecuting attorney after a criminal investigation occurred.

Next, Petitioners cite several facts that, they argue, demonstrate Respondents' "gross negligence, willful and wanton misconduct or intentional misconduct." These include: 1) Respondents' failure to maintain accurate records; 2) Respondents' failure to immediately refer the financial exploitation investigation to the appropriate law enforcement agency; 3) Respondents' failure to "fact-check" information and to obtain financial information legally by obtaining subpoenas and/or appropriate releases; and 4) making false, unsubstantiated accusations against Mr. Boswell. The circuit court determined that these "skeletal arguments" were insufficient to overcome Respondents' entitlement to qualified immunity. We agree.

This Court has ruled that "skeletal assertions" are insufficient to strip the DHHR of qualified immunity:

> Also, like *Payne*, in discovery, respondent made the skeletal assertion that if D.H. were properly trained and supervised, the rape would not have occurred. This illusory and languid contention is no more sufficient to overcome the State's immunity in this case than in *Payne*: "Respondents seem to argue simply that if the DHHR defendants were doing their job properly, this incident would not have occurred. . . . Although this overly simplistic analysis may be appealing in light of these tragic events, qualified immunity insulates the State and its agencies from liability based on vague or principled notions [of government responsibility]."

*A.B.*, 234 W. Va. at 516 n.33, 766 S.E.2d at 775 n.33 (*citing W. Va. Dep't of Health and Human Resources v. Payne*, 231 W. Va. 563, 574, 746 S.E.2d 554, 565 (2013)).

We also note that these skeletal assertions are at odds with the record. It is undisputed that Respondents referred this matter to law enforcement; that law enforcement officials obtained Mr. Boswell's financial information from various banks pursuant to a subpoena; and that Mr. Boswell did not deny that he held himself out to be Mrs. Vanderpool's son, nor did he deny that all of the Vanderpools' real estate and bank accounts that were placed in trust during the criminal investigation eventually went to him.

Finally, we agree with the circuit court's conclusion that Ms. Stanley is entitled to qualified immunity based on W. Va. Code § 9-6-2(d), which provides:

> No adult protective services caseworker may be held personally liable for any professional decision or action thereupon arrived at in the performance of his or her official duties as set forth in this section or agency rules promulgated thereupon: Provided, That nothing in this subsection protects any adult protective services worker from any liability arising from the operation of a motor vehicle or for any loss caused by gross negligence, willful and wanton misconduct or intentional misconduct.

In so ruling, we agree with the circuit court's determination that:

The actions undertaken by Adult Protective Services and Ms. Stanley were precisely the kind of actions and investigation intended by the Legislature's adoption and pronouncement of

the rights, duties and responsibilities of Adult Protective Services and its workers under [W. Va. Code § 9-6-2 *et seq.*]. Therefore the Court finds that even when considering the facts of this matter in a light most favorable to the plaintiffs, the plaintiffs have failed to clearly establish any constitutional or statutory violations, nor any fraudulent, malicious or oppressive conduct on [the] part of the defendants.

Based on the foregoing, we affirm the circuit court's January 14, 2019, order.

Affirmed.

ISSUED:  May 26, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

**NOT PARTICIPATING:**

Justice Margaret L. Workman

13