**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

January 2017 Term

_____

No. 15-0691

_____

**FILED**

**January 26, 2016**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**WEST VIRGINIA STATE POLICE,
CORPORAL R.D. ESHBAUGH, CORPORAL Z.L. NINE, and
TROOPER FIRST CLASS J.D. SEE,**
Defendants below, Petitioners

v.

**VICTORIA HUGHES, individually and as the
administratrix of the estate of Walter N. Hughes,
KRISTINA ARNTZ, KRISTAL HUGHES, and
KRISTIE CANFIELD,**
Plaintiffs below, Respondents

_____

**Appeal from the Circuit Court of Berkeley County
The Honorable Gray Silver, III, Judge
Civil Action No. 13-C-578**

**REVERSED AND REMANDED**

_____

**Submitted: January 10, 2016
Filed: January 26, 2016**

**Michael D. Mullins, Esq.**
**Robert L. Bailey, Esq.**
**Steptoe & Johnson PLLC**
**Charleston, West Virginia**
**Tracey B. Eberling, Esq.**
**Steptoe & Johnson PLLC**
**Martinsburg, West Virginia**
**Counsel for the Petitioners**

**Harry P. Waddell, Esq.**
**Martinsburg, West Virginia**
**Counsel for the Respondents**

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syllabus Point 2, *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009).

2.      "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syllabus Point 1, *Findley v. State Farm Mut. Auto. Ins. Co*., 213 W.Va. 80, 576 S.E.2d 807 (2002).

3.      "Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Syllabus, in part, *Bennett v. Coffman*, 178 W.Va. 500, 361 S.E.2d 465 (1987).

Justice Ketchum:

In this appeal from the Circuit Court of Berkeley County, we apply the doctrine of qualified immunity. The plaintiffs contend that several West Virginia State Police employees were negligent in their duties. Under the doctrine of qualified immunity, state government employees are immune for negligent acts committed in the exercise of discretion; government employees can be liable only if their actions violate some clear legal or constitutional right. The doctrine shields officials from harassment, distraction, and liability when they exercise their discretion within the bounds of the law.

The record on appeal, even viewed in a light most favorable to the plaintiffs, indicates that the plaintiffs failed to show how the actions of the State Police employees violated any clear legal or constitutional right. However, the circuit court refused to afford the State Police employees qualified immunity. As set forth below, we reverse the circuit court's decision and remand the case for entry of summary judgment in favor of the State Police and its employees based on qualified immunity.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

Decedent Walter Hughes and plaintiff Victoria Hughes were married in 1962. It appears that, throughout the marriage, Mr. Hughes repeatedly engaged in extra-marital affairs. In April 2012, Mrs. Hughes learned that her husband was engaging in

1

another affair. Fearing her husband, because he had a propensity for verbal abuse and often carried a gun, Mrs. Hughes moved out of the couple's house.

On April 13, 2012, two of the Hughes's daughters (plaintiffs Kristina Arntz and Kristal Hughes) met with their father at the family's house to retrieve some of Mrs. Hughes's personal items. In the 15 minutes spent in the residence, both women say that their father became argumentative and brandished a gun, pointing it at Kristina. Mr. Hughes then pointed the gun at his chest and said, "I'm going to blow my f---g heart out," and, "You had better say goodbye to me Kristina. This is the last time you'll ever speak to me." He also said he would be dead by midnight. The two daughters left the Hughes's residence and retreated to Kristal's home across the street.

Fearing that Mr. Hughes might follow and harm them (or might seek out Mrs. Hughes and harm her), the two daughters collected their children and drove to the barracks of the defendant, the West Virginia State Police. They encountered a State Police office assistant, Barbara Boward, and told her they needed help. The daughters assert they told the office assistant: (1) that Mr. Hughes was threatening to kill himself, and (2) that Mr. Hughes had threatened Kristina with a gun, and that she feared for her life. The office assistant, however, claims the daughters never told her that Mr. Hughes had threatened Kristina. Regardless, when the office assistant contacted a dispatcher, she only relayed information that Mr. Hughes had a gun and was threatening to commit suicide.

Three State Police troopers (hereafter identified as the "April Troopers") were dispatched to the Hughes's residence at about 12:50 p.m. Mr. Hughes allegedly

2

told the April Troopers that he had been caught cheating on his wife, but he repeatedly denied planning to kill himself. He admitted to having guns in the house and a pat down by the April Troopers found he was not carrying a weapon. The April Troopers spoke to him for about 15 minutes, and concluded that Mr. Hughes was calm and did not appear to be a threat to himself.

As the April Troopers left the Hughes's residence, they spoke to Kristal's boyfriend, Todd Jones, who also lived across the street. One of the April Troopers told the boyfriend they could not detain Mr. Hughes or take his guns because he was not threatening himself or others. The boyfriend asserts the trooper said, "He is 68 years old, he can do what he wants." The trooper told the boyfriend that the family could take the guns if they could get Mr. Hughes out of the house, and may have suggested the family could file a mental hygiene petition if they viewed Mr. Hughes as a threat to himself or others.

Back at the State Police barracks, the office assistant told the two daughters, "Everything is okay." When asked if Mr. Hughes had been taken to a hospital or otherwise taken into custody, the office assistant said, "No, they said he was fine." The daughters left the barracks but, allegedly fearing their father, declined to go back to the Hughes's residence.

At 2:39 p.m., Mr. Hughes sent a text message to Kristina's phone saying, "You can tell your mother that she can move back in tomorrow. There is an $82,000 check in her name on the table. I am so sorry this happened, Kristina. I love you." Kristina did not respond to the text.

Kristal returned to her home around 7:30 p.m., and she and her boyfriend saw no lights or movement in the Hughes's residence across the street. Between 8:00 and 8:30 p.m., the Hughes family phoned the State Police barracks and requested a check on Mr. Hughes's welfare. Troopers who responded inspected the residence and found a typed suicide note, a cashier's check for $82,000 made out to Mrs. Hughes, some jewelry, a wallet, and Mr. Hughes's cellphone. Mr. Hughes, however, was not found. At the request of the troopers, Kristina filed a missing person report.

Seven months later, on November 29, 2012, at about 1:10 p.m., the State Police received a report about a human skull found in an old quarry near the Hughes's residence.[1] Three troopers[2] (hereafter referred to as the "November Troopers") responded to the quarry, a 20-plus-acre abandoned shale pit overgrown with foliage and brush. The State Police aver that the November Troopers searched a 6,000 square foot area at least three times. Beginning where the skull was found, the November Troopers located concrete blocks covered by a wood plank that was set up like a seat. There, they found a tan jacket, a black t-shirt, part of a rib cage, and arm bones. Within fifty feet of

---

[1] A document in the record indicates the area where the skull was found is approximately 630' away from the Hughes's residence.

[2] The three troopers were defendants R.D. Eshbaugh, Z.L. Nine, and J.D. See. Trooper Eshbaugh was previously assigned to investigate the missing person report for Mr. Hughes, and was immediately under the impression the remains could have been Mr. Hughes. A fourth trooper, J.M. Walker, responded to the scene but was called away shortly after arriving.

4

the concrete blocks the troopers found shorts, a belt, the top half of a set of dentures, two femur bones, vertebrae, part of a hip bone, and several other bones.

The November Troopers photographed, documented, mapped, and bagged the items found. When the shirt by the concrete blocks was moved, the troopers found a handgun. Taken together, the evidence indicated Mr. Hughes was sitting on the cement blocks prior to shooting himself and fell forward and slightly to the left. The plaintiffs assert that the November Troopers only searched the quarry when they initially arrived. The November Troopers allege they conducted several searches, and that they remained on the scene until about 5:00 p.m., when it began to get dark. Thereafter, a trooper visited the Hughes's residence, told the family the evidence that was recovered, and said he thought the remains were those of Mr. Hughes.

The next day, November 30, 2012, the plaintiffs (and other family members, including a third Hughes daughter, plaintiff Kristie Canfield) visited the quarry. Soon after their arrival, they found the bottom half of Mr. Hughes's dentures, part of a jaw bone, an arm bone, finger bones, vertebrae, a rib, and pelvic bones. The family called the medical examiner's office, and a trooper responded to secure the remains. The trooper allegedly "dug around more in that area, in that immediate area, to try and locate anything else that may be behind," but found nothing else. The bones were transported to the funeral home.

On December 3, 2012, the Hughes's fourth daughter, Kristen (who was visiting from Germany and is not a plaintiff), went to visit the quarry with the plaintiffs.

5

While there, the family discovered another of Mr. Hughes's bones. Troopers again responded, secured the bone and took it to the funeral home.

Several days later, a family friend searched the quarry using rakes and a leaf blower. Six to eight feet from the concrete blocks the friend found the shell casing for the bullet that appears to have killed Mr. Hughes. No other bones were found.

Despite the searches of the quarry on four different days, a significant portion of Mr. Hughes's skeleton was never found. The defendants tactfully suggest that wildlife may have disturbed the remains in the seven months before they were found.

On August 12, 2013, the plaintiffs (Mrs. Hughes and three of her four daughters) filed the instant case against the State Police.[3] The plaintiffs asserted two causes of action against the defendants. First, the plaintiffs claimed the defendants were liable for the wrongful death of Mr. Hughes. The plaintiffs essentially contended that the State Police office assistant, Ms. Boward, knew or should have known that Mr. Hughes had the potential to harm himself or others, and because of her alleged miscommunication the State Police negligently or recklessly breached a duty to protect Mr. Hughes and others by failing to take him into custody. Second, the plaintiffs asserted that the November Troopers negligently or recklessly mishandled the remains of Mr. Hughes, thereby causing severe mental anguish to the plaintiffs.

---

[3] The plaintiffs also brought suit against the three April Troopers and the three November Troopers. The plaintiffs later consented to the dismissal of the April Troopers by the circuit court. The plaintiffs conceded that the April Troopers had acted properly based on the information provided by the office assistant to the dispatcher.

6

After the parties conducted discovery, the State Police filed a motion for summary judgment. The State Police argued that the actions of the office assistant who spoke to Mr. Hughes's two daughters in April 2012, and the later actions of the November Troopers who searched the quarry, were discretionary acts protected by the doctrine of "qualified immunity." Under the doctrine of qualified immunity, State Police employees cannot be found liable for merely negligent acts caused in the exercise of discretion.

The circuit court, however, determined that the duties of the State Police employees in this case were not discretionary but rather were ministerial and non-discretionary. The circuit court further found that the State Police employees had taken on a "special duty" toward the plaintiffs, and could be liable for negligently breaching that duty. In an order dated July 13, 2015, because of the many material facts in question, the circuit court denied the State Police's motion for summary judgment, and refused to afford the State Police and its employees qualified immunity. The circuit court concluded that a jury should weigh the allegedly negligent actions of the State Police employees.

The State Police now appeals the circuit court's interlocutory order concerning qualified immunity.

## II.
## STANDARD OF REVIEW

7

"A circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine."[4] "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court."[5]

## III.
## ANALYSIS

This appeal presents overlapping legal theories concerning governmental immunity. On the one hand, the State Police asserts that the actions of its employees in this case were discretionary, and therefore protected by the doctrine of qualified immunity. On the other hand, the plaintiffs contend the actions of the State Police employees were non-discretionary, ministerial responsibilities, and are therefore covered by the "public duty" doctrine. Application of either doctrine reaches the same result, and permits the government to avoid liability for its negligent actions. The latter doctrine, however, has an exception that allows the government to be held liable if it assumes a "special duty" toward an individual. The plaintiffs contend the State Police employees assumed, and then breached, a special duty toward the plaintiffs.

---

[4] Syllabus Point 2, *Robinson v. Pack,* 223 W.Va. 828, 679 S.E.2d 660 (2009).

[5] Syllabus Point 1, *Findley v. State Farm Mut. Auto. Ins. Co.,* 213 W.Va. 80, 576 S.E.2d 807 (2002).

8

Under the doctrine of qualified immunity, the discretionary actions of government agencies, officials and employees performed in an official capacity are shielded from civil liability so long as the actions do not violate a clearly established law or constitutional duty. "Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[6]

Furthermore, "[a] public officer is entitled to qualified immunity for discretionary acts, even if committed negligently."[7] Qualified immunity is broad and protects "all but the plainly incompetent or those who knowingly violate the law."[8] As this Court said:

> 4. If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

---

[6] Syllabus, in part, *Bennett v. Coffman,* 178 W.Va. 500, 361 S.E.2d 465 (1987). *See also* Syllabus, in part, *State v. Chase Sec., Inc.,* 188 W.Va. 356, 424 S.E.2d 591 (1992) ("A public executive official who is acting within the scope of his authority . . . is entitled to qualified immunity from personal liability for official acts if the involved conduct did not violate clearly established laws of which a reasonable official would have known.").

[7] *Maston v. Wagner*, 236 W.Va. 488, 500, 781 S.E.2d 936, 948 (2015).

[8] *Hutchison v. City of Huntington*, 198 W.Va. 139, 148, 479 S.E.2d 649, 658 (1996) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

6. In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W.Va.Code § 29–12A–1 *et seq.,* and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.[9]

The State Police contends that the office assistant and the November Troopers exercised judgment and discretion in their actions. The State Police asserts there is no question that in April 2012, the office assistant relayed information about Mr. Hughes to a dispatcher; there is only a dispute about whether the office assistant erred in the judgment and choices she made in relaying that information. Likewise, the State Police asserts there is no question that the November Troopers searched the quarry and photographed, documented, mapped and recovered some of Mr. Hughes's remains. The dispute concerns errors in the choices the November Troopers made when they searched the quarry. The State Police argues that the conduct of its employees, while at worst negligent, violated no clearly established statutory or constitutional duty toward the plaintiffs. Therefore, the exercise of discretion by the State Police employees was protected by qualified immunity.

---

[9] Syllabus Points 4 and 6, *Clark v. Dunn,* 195 W.Va. 272, 465 S.E.2d 374 (1995).

The circuit court, however, found that the actions of the State Police employees were not discretionary, and then applied a different legal theory: the public duty doctrine. Under the public duty doctrine, a government entity or officer cannot be held liable for breaching a general, non-discretionary duty owed to the public as a whole. "Often referred to as the 'duty to all, duty to no one' doctrine, the public duty doctrine provides that since government owes a duty to the public in general, it does not owe a duty to any individual citizen."[10] For example, under the public duty doctrine, "the duty to fight fires or to provide police protection runs to all citizens and is to protect the safety and well-being of the public at large[.]"[11] Generally, no private liability attaches when a fire department or police department fails to provide adequate protection to an individual. The public duty doctrine is restricted to "liability for nondiscretionary (or 'ministerial' or 'operational') functions[.]"[12]

The exception to the public duty doctrine arises when a "special relationship" exists between the government entity and a specific individual. "The state may be liable where it has taken on a special duty to a specific person beyond that

---

[10] John Cameron McMillan, Jr., "Government Liability and the Public Duty Doctrine," 32 Vill. L. Rev. 505, 509 (1987) (footnotes omitted).

[11] *Wolfe v. City of Wheeling*, 182 W.Va. 253, 256, 387 S.E.2d 307, 310 (1989).

[12] *Parkulo v. W.Va. Bd. of Prob. & Parole*, 199 W.Va. 161, 174, 483 S.E.2d 507, 520 (1996) (quoting *Randall v. Fairmont City Police Dep't*, 186 W.Va. 336, 346, 412 S.E.2d 737, 747 (1991)).

extended to the general public."[13]  In determining whether a "special relationship" or "special duty" exists, a plaintiff must prove four factors:

> (1) An assumption by the state governmental entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the state governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the state governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the state governmental entity's affirmative undertaking.[14]

"Qualified immunity is, quite simply, immunity from suit.  The public duty doctrine is a defense to negligence-based liability, i.e. an absence of duty."[15]  A government entity can assert qualified immunity when a government official's duties "derive from discretionary 'judgments, decisions, and actions[.]'"[16]  The government entity can interpose the public duty doctrine as a defense when it perceives a plaintiff is attempting to hold the entity liable for breach of a non-discretionary duty owed to the general public.[17]  When a duty owed to the general public is at issue, a plaintiff may then

---

[13] Barry A. Lindahl, 2 Modern Tort Law: Liability and Litigation § 16:20 (2d ed. 2008).

[14] Syllabus Point 12, *Parkulo v. West Virginia Bd. of Probation and Parole,* 199 W.Va. 161, 483 S.E.2d 507 (1996).

[15] *W.Va. Dep't of Health & Human Res. v. Payne*, 231 W.Va. 563, 568, 746 S.E.2d 554, 559 (2013).

[16] *Id.*, 231 W.Va. at 572, 746 S.E.2d at 563.

[17] We recognize that our prior caselaw analyzing and applying the qualified immunity doctrine and the public duty doctrine "has created a patchwork of holdings" in which there is an "absence of harmony." *Payne*, 231 W.Va. at 571, 746 S.E.2d at 562.

respond with proof that the government entity adopted a special duty toward that specific plaintiff.

In the instant case, the circuit court ruled that the State Police was not entitled to qualified immunity because the actions of its employees did not involve discretion. The circuit court ruled that the plaintiffs' case involved non-discretionary general duties owed to the general public. The circuit court therefore applied the public duty doctrine and found questions of fact existed regarding whether the plaintiffs could establish that a "special relationship" existed. The circuit court determined that the office assistant could not exercise discretion in her job, and that she had a ministerial duty to transmit any information she received to a dispatcher. Likewise, the circuit court determined that the November Troopers had a ministerial, non-discretionary duty to search the quarry, and equated the failure to find all of Mr. Hughes's remains with a failure to search.

After careful examination of the record, we reject the circuit court's characterization of the actions of the State Police employees. The actions of the office assistant and of the November Troopers clearly involved the exercise of discretion. The plaintiffs are alleging that the State Police employees were negligent in their exercise of that discretion, and have introduced no evidence to support a finding these actions violated a clear legal or constitutional right. On this record, we find that the State Police and its employees are entitled to qualified immunity.

First, as to the office assistant, the plaintiffs have not directed us to any constitutional provision, statute, case, regulation, or any other law requiring a State Police

13

office assistant to transmit any particular information to a dispatcher.[18]  The office assistant was tasked to help individuals who came into the State Police barracks, and the evidence indicates that the office assistant did just that and spoke with Kristina and Kristal.  We cannot know precisely what the two plaintiffs said to the office assistant, or how quickly and clearly it was said, and we likewise cannot know precisely what the office assistant said or heard.  As Kristal said in her deposition, "[W]e were both hysterical, telling the dispatcher we needed help."  What we do know is that the office assistant exercised some form of discretion, collated and translated the information that Kristina and Kristal presented, and passed that information to a dispatcher.  In the office assistant's exercise of discretion, "[s]he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby."[19]  The circuit court should therefore have granted qualified immunity to the State Police for the actions of the office assistant.

---

[18] There is likewise no authority declaring that the State Police had a non-discretionary duty to arrest Mr. Hughes for threatening his daughter Kristina.  We can find no constitutional, statutory, or common-law right for a person to be arrested to prevent the person's potential later suicide.  *See Hoffa v. United States*, 385 U.S. 293, 310 (1966) ("There is no constitutional right to be arrested."); *State v. Steadman*, 827 So.2d 1022, 1025 (Fla. Ct. App. 2002) (noting that "a defendant does not have a right to be arrested in order to be prevented from committing further crimes"); *State v. Monaco*, 83 P.3d 553, 558 (Ariz. Ct. App. 2004) (There is no right to be arrested.  "The decision of when to arrest a person is not mandated by statute; the government must be permitted to exercise its own judgment in determining at what point in an investigation enough evidence has been obtained." (Quotation omitted)).

[19] Syllabus Point 4, *Clark v. Dunn*, 195 W.Va. at 273, 465 S.E.2d at 375.

14

Second, as to the November Troopers' search of the quarry, the plaintiffs have not directed us to any constitutional provision, statute, case, regulation, or any other law governing the length of time or the method by which a State Police trooper must search a potential crime scene. The record clearly establishes that the November Troopers searched the quarry, and in that search found and recovered some of Mr. Hughes's remains. The November Troopers halted their search in the overgrown quarry after nearly four hours as darkness fell. Exercising their judgment and discretion, the November Troopers decided not to resume the search the next day and decided to apply State Police resources to other tasks. As with the office assistant, the November Troopers are not liable for negligence or other error in their decisions. The circuit court should therefore have granted qualified immunity to the State Police for the actions of the November Troopers.[20]

## IV.
## CONCLUSION

---

[20] The State Police also challenges the plaintiffs' assertion of a cause of action for "mishandling" Mr. Hughes's remains. This Court has recognized "[a] cause of action exists for negligently or intentionally mishandling or losing a dead body, even when its disinterment and reinterment are authorized." Syllabus Point 2, *Whitehair v. Highland Memory Gardens, Inc.*, 174 W.Va. 458, 327 S.E.2d 438 (1985). In this case, the plaintiffs do not assert that the State Police mishandled or lost a dead body; they assert the November Troopers were negligent in failing to discover the entirety of the decedent's bodily remains during their initial search of the quarry. On this record, we decline to weigh whether the plaintiffs asserted a proper claim because we find the discretionary actions of the November Troopers were protected by qualified immunity.

The State Police is entitled to qualified immunity to protect the discretionary actions of its employees. The circuit court erred in holding otherwise.

Accordingly, the circuit court's July 13, 2015, order denying summary judgment and denying qualified immunity to the State Police and its employees is reversed. The case is remanded for entry of summary judgment in favor of the State Police and its employees, and for any further proceedings consistent with this opinion.

Reversed and remanded.