## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**West Virginia Division of Corrections,**
**Scott Patterson, and Jason Walton,**
**Petitioners, Defendants below,**

**vs.) No. 18-0705** (Kanawha County 13-C-578)

**P.R.,**
**Respondent, Plaintiff below.**

**FILED**

**November 22, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The petitioners West Virginia Division of Corrections ("DOC"), Scott Patterson, and Jason Walton (collectively referred to herein as "the defendants") filed an interlocutory appeal of the July 17, 2018, order of the Circuit Court of Kanawha County denying their motion to alter or amend a judgment. The order that they were seeking to have altered or amended was the portion of the circuit court's November 27, 2017, order that denied their motion for summary judgment on a negligence claim. The defendants argue that they have qualified immunity from the negligence claim. The respondent P.R.[1] (plaintiff below) argues that the circuit court correctly denied summary judgment on this issue.[2]

After considering the parties' written and oral arguments, as well as the record on appeal and the applicable law, this Court finds that the defendants are entitled to qualified immunity from P.R.'s negligence claim. Because our decision relies upon well-settled law, we find that this case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure and is appropriate for disposition in a memorandum decision. For the reasons set forth below, the circuit court's decision regarding qualified immunity for the negligence claim is reversed, and this case is remanded for entry of an order granting summary judgment to the defendants.

---

[1] Due to the sensitive nature of the facts asserted in this case, we adhere to our usual practice of referring to the alleged victim by her initials only. *See, e.g.*, *State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990); *see also* W.Va. R. App. P. 40(e).

[2] The petitioners, defendants below, are represented by Charles R. Bailey, Esq., David J. Mincer, Esq., and Michael W. Taylor, Esq. The respondent, plaintiff below, is represented by Kerry A. Nessel, Esq.

1

**Facts and Procedural History**

In 2011, P.R. served a term of incarceration at the Anthony Correctional Center ("ACC"). The ACC is a facility operated by the DOC that primarily houses young adult offenders between the ages of eighteen and twenty-five years old, both male and female. Defendant Patterson was the Warden at ACC, while Defendant Walton was the Associate Warden.

P.R. alleges that during the lunch hour on or about September 5, 2011, she entered the women's outdoor bathroom facility in the ACC recreation yard. She contends that inside the bathroom, she was physically restrained and sexually assaulted, both vaginally and anally, by three male inmates. P.R. asserts that she did not immediately report that she was raped because the assailants threatened to kill her if she told.

On September 28, 2011, P.R. informed ACC staff that she had been sexually assaulted. At the time, she was being transferred out of ACC to a regional jail due to her violation of institutional rules. A correctional officer wrote the following in an Incident Report prepared that day:

> . . . [P.R.] also made accusations about how ACC had not protected her and that she wanted to go back to the Regional Jail where she wouldn't be beat up and raped. . . . We then asked about the rape, and she said that she had told Sgt. Dilley that she was going to be raped, and that he had better do a report on that. . . . She claimed that there was three male inmates that had raped [her] while she was in the bathroom on the back yard. She claims that all three of these guys are still housed here, and that's why she won't say their names. She claimed that this happened shortly after she had started Vocations, on 05 Sept. 2011.

According to the Incident Report, P.R. blamed a Correctional Officer Fox for failing to adequately supervise the recreation yard. The DOC investigated P.R.'s rape allegation, ultimately concluding that "due to conflicting statements of the victim and the accused, and no known independent witnesses or physical evidence, the accusation . . . is unsubstantiated."

P.R. filed this civil action in circuit court in March 2013 contending that the DOC and its employees failed to provide a safe confinement facility and failed to protect her from being raped. She asserted claims for violation of multiple state and federal constitutional rights; intentional infliction of emotional distress/outrage; common law negligence including negligent supervision, training, and retention of staff and negligent

2

supervision of inmates; invasion of privacy; and civil conspiracy.[3] Ultimately, the circuit court dismissed or granted summary judgment in favor of the defendants on all of P.R.'s claims except negligence.

The defendants argued to the circuit court that they were also entitled to summary judgment on the negligence claim. They asserted that even assuming *arguendo* there was negligence on their part, they have qualified immunity because any acts or omissions were not in violation of a clearly established statutory or constitutional right or law of which a reasonable person would have known, and were not otherwise fraudulent, malicious, or oppressive.[4]

In response to the defendants' motion for summary judgment, P.R. argued that a clearly established law was violated, specifically, DOC Policy Directive 332.02, which provides in part:

> An inmate may report a sexual assault/abuse to any employee. Any employee that receives a report of a sexual assault/abuse or possible sexual assault/abuse, whether verbally or in writing, shall immediately notify the Shift Commander and complete an Incident Report.

DOC Policy Dir. 332.02(V)(A)(1).[5]

---

[3] In addition to suing the DOC, Warden Patterson, and Associate Warden Walton, P.R. also sued Correctional Officer Fox and unknown John Doe defendants. Correctional Officer Fox was not properly served and was dismissed from the lawsuit.

[4] *See* Syl. Pt. 11, *W.Va. Reg'l Jail & Corr. Facility Auth.*, 234 W.Va. 492, 766 S.E.2d 751 (2014), discussed *infra*.

[5] The full text of Policy Directive 332.02(V)(A) provides:

V. PROCEDURE

A. Reporting of Sexual Assault or Sexual Abuse

> 1. An inmate may report a sexual assault/abuse to any employee. Any employee that receives a report of a sexual assault/abuse or possible sexual assault/abuse, whether verbally or in writing, shall immediately notify the Shift Commander and complete an Incident Report. One Copy of any and all such Incident Reports related to a suspected or an alleged Sexual Assault/Abuse will be forward[ed] to the Director of Security in the Central Office on the next business day.

P.R. argued that she had complained to Sergeant Dilley about rude and blatant sexual comments that male inmates directed toward her, but contrary to this Policy Directive, the sergeant did not inform the shift commander or file an incident report, and she was subsequently assaulted.[6]

During her discovery deposition, P.R. testified as follows regarding the comments that male inmates had made to her prior to the alleged assault:

BY MR. MINCER [defense counsel]:

Q: [Did] Any of them [the male inmates] threaten you before this happened? I'm going to do this or that to you or –
A. They would just say what they would like to do to me on the rec yard, but it wasn't really a threat.

---

2. The Shift Commander shall ensure that the alleged victim/inmate and the aggressor are physically separated.

3. The alleged inmate/victim shall be advised by the employee receiving the report and/or the Shift Commander to not shower or otherwise clean himself/herself, or if the assault was oral, to not drink or brush his/her teeth, or otherwise take any action that could damage or destroy evidence.

4. If the alleged assault has occurred within the previous seventy-two (72) hours, or other circumstances dictate, arrangements shall be promptly made to have the alleged inmate/victim examined by medical services.

The remaining subsections of Policy Directive 332.02(V) specify steps that DOC officials will make when investigating an "alleged sexual assault," including how to treat the alleged victim and the alleged perpetrator.

[6] P.R. asserts that her complaint to Sergeant Dilley occurred approximately one week before the alleged assault on September 5, 2011. The DOC denies that there was any such complaint to Sergeant Dilley, but asserts that even if there was a complaint, based upon P.R.'s overall description of events it would have occurred months before September 5, 2011. The appendix record on appeal does not contain a deposition of Sergeant Dilley and, regardless, the exact date of any such complaint is irrelevant to our qualified immunity analysis on appeal.

Q. Okay. What would they say? What would they say that wanted to do to you?

A. Just –

MR. NESSEL [plaintiff's counsel]:

Go ahead. Tell him verbatim.

BY MR. MINCER:

Q. Yeah. That's – I need the best you can remember of what any of these guys told you beforehand.

A. How if we wasn't in prison, they'd f*** me real hard and –

Q. Meaning those three guys in specific told you things like that?

A. I mean, it was more than just those three guys. It was a group.

Q. Yeah. Let me – and I don't mean to interrupt you, but here's what I'm wondering is you've told me already that generally the guys in the group would say things like to you. And I'm wondering those guys, three guys in specific, if they had said things to you like that? And if so, what did they say to you?

A. I mean, they were there whenever they were said and they might've even said them. But most of the time I wouldn't even look at them when they were saying it to see who said it, you know?

Q. So it's kind of like –

A. I try to ignore it.

In response to the defendants' motion for summary judgment, P.R. submitted an affidavit indicating that if defense counsel would have allowed her to finish her answer during the deposition, she "would have continued with the following: How the group told me that they wanted to hit that phat ass, f*** that phat ass, tap that phat ass and other similar sexual comments." She further averred that of the approximately ten male inmates who were saying this to her, three were the perpetrators of the subsequent sexual assault. She additionally averred that she "informed Sgt. Dilley of the sexual comments mentioned above approximately one week prior to being gang raped. He did not question me and, to the best of my knowledge, did not question the group of male inmates who were making the sexual comments to me."

The defendants argued that Policy Directive 332.02 is not a clearly established law of which a reasonable person would have known for purposes of defeating qualified immunity, but even if it were, the policy does not apply to a threat of potential future sexual assault. The defendants argued that the policy only specifies actions that correctional staff must take *after* a sexual assault, or an act that may possibly constitute a sexual assault, has been committed. The circuit court disagreed with the DOC, concluding that the policy is a

5

clearly established law applicable to threatened sexual assault. However, the circuit court found that there were genuine issues of material fact regarding whether P.R.'s complaint to Sergeant Dilley was made, when it was made, and whether the contents of P.R.'s alleged complaint to Sergeant Dilley were sufficiently specific to put the DOC on notice that it must comply with Policy Directive 332.02.

Accordingly, by order entered November 27, 2017, the circuit court denied the defendants' motion for summary judgment on P.R.'s common law negligence claim.[7] Thereafter, the defendants filed their motion to alter or amend the judgment, which was denied on July 17, 2018. In this appeal, the defendants file an interlocutory challenge to the circuit court's refusal to grant summary judgment on the negligence claim on the basis of qualified immunity.[8]

**Standard of Review**

As an initial matter, we observe that an order denying summary judgment is ordinarily not appealable. However, when qualified immunity applies, the immune defendants are protected from the burden of litigation—not merely from an adverse judgment. *See Hutchison v. City of Huntington*, 198 W.Va. 139, 148, 479 S.E.2d 649, 658 (1996). Accordingly, "[a] circuit court's denial of summary judgment that is predicated on qualified immunity is an interlocutory ruling which is subject to immediate appeal under the 'collateral order' doctrine." Syl. Pt. 2, *Robinson v. Pack*, 223 W.Va. 828, 679 S.E.2d 660 (2009). When qualified immunity is at issue,

> [t]he ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.

*Hutchison*, 198 W.Va. at 144, 479 S.E.2d at 654, syl. pt. 1.

The specific order on appeal in this case is an order denying the defendants' motion to alter or amend judgment. "The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W.Va. R. Civ. P. 59(e), is the same standard

---

[7] The same order granted summary judgment to the defendants on all remaining claims.

[8] The validity of the circuit court's dismissal of P.R.'s other claims is not currently before this Court.

6

that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." Syl. Pt. 1, *Wickland v. American Travellers Life Ins. Co.*, 204 W.Va. 430, 513 S.E.2d 657 (1998). The underlying order which the defendants sought to have altered or amended was an order partially denying summary judgment. "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. Pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002). Using this plenary standard, we turn to the parties' arguments on appeal.

## Discussion

The overarching question on appeal is whether the defendants have qualified immunity to P.R.'s claim of negligence. The first step in a qualified immunity analysis is to determine the nature of the governmental actions or omissions in dispute. On that question, this Court has held the following:

> To determine whether the State, its agencies, officials, and/or employees are entitled to immunity, a reviewing court must first identify the nature of the governmental acts or omissions which give rise to the suit for purposes of determining whether such acts or omissions constitute legislative, judicial, executive or administrative policy-making acts or involve otherwise discretionary governmental functions. To the extent that the cause of action arises from judicial, legislative, executive or administrative policy-making acts or omissions, both the State and the official involved are absolutely immune pursuant to Syl. Pt. 7 of *Parkulo v. W.Va. Bd. of Probation and Parole*, 199 W.Va. 161, 483 S.E.2d 507 (1996).

Syl. Pt. 10, *W.Va. Reg.'l Jail & Corr. Facility Auth. v. A.B.*, 234 W.Va. 492, 766 S.E.2d 751 (2014). In her complaint, P.R. asserted that the defendants' negligent acts or omissions were the failure to provide a reasonably safe facility; the failure to properly staff, hire, supervise, train and retain correctional officers; and the failure to adequately supervise the inmates. In response to the defendants' motion for summary judgment, P.R. made the more specific allegation that Sergeant Dilley, a correctional officer, was negligent for failing to follow Policy Directive 332.02. She contends that pursuant to this policy, Sergeant Dilley should have informed the shift commander and filed an incident report when P.R. complained that male inmates had made sexual comments to her.[9] In *A.B.*, this Court recognized that the general duties of a correctional officer fall within the category of "discretionary" duties of the government. *Id.* at 509, 766 S.E.2d at 768 ("general functions

---

[9] P.R. is apparently asserting that the DOC is liable under a theory of *respondeat superior* for an omission by Sergeant Dilley. She does not explain how the warden and associate warden would be vicariously liable for this purported omission.

as a correctional officer, like most law enforcement officers, are *broadly* characterized as discretionary, requiring the use of his discretionary judgments and decisions.”). Indeed, the parties herein do not seem to dispute that P.R.’s negligence claim falls within the category of discretionary acts.

West Virginia law accords qualified immunity protection to the discretionary functions of a government official or agency that are merely negligent.

> In the absence of an insurance contract waiving the defense, the doctrine of qualified or official immunity bars a claim of mere negligence against a State agency not within the purview of the West Virginia Governmental Tort Claims and Insurance Reform Act, W.Va. Code § 29-12A-1 *et seq.*, [10] and against an officer of that department acting within the scope of his or her employment, with respect to the discretionary judgments, decisions, and actions of the officer.

Syl. Pt. 6, *Clark v. Dunn*, 195 W.Va. 272, 465 S.E.2d 374 (1995) (footnote added); *accord Crouch v. Gillispie*, 240 W.Va. 229, 234, 809 S.E.2d 699, 704, (2018) (“A public officer is entitled to qualified immunity for discretionary acts, even if committed negligently.”) (Internal citation and quotation marks omitted). The scope of qualified immunity is broad. If the action or omission is within the public officer’s authority, the officer is immune from private suit for negligence:

> If a public officer is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority, and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.

*Clark*, 195 W.Va. at 273, 465 S.E.2d at 375, syl. pt. 4. As this Court has observed, “[q]ualified immunity is broad and protects ‘all but the plainly incompetent or those who knowingly violate the law.’” *W.Va. State Police v. Hughes*, 238 W.Va. 406, 411, 796 S.E.2d 193, 198 (2017) (quoting *Hutchison*, 198 W.Va. at 148, 479 S.E.2d at 658, and *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The “sweep of these immunities is necessarily broad” because “public servants exercising their official discretion in the discharge of their duties cannot live in constant fear of lawsuits, with the concomitant costs to the public servant and society.” *Hutchison*, 198 W.Va. at 148, 479 S.E.2d at 658 (citations omitted).

---

[10] The Governmental Tort Claims and Insurance Reform Act is not applicable to the defendants in this case, who are a state agency and state officials.

8

To defeat qualified immunity for discretionary functions, a plaintiff must make the following showing:

> To the extent that governmental acts or omissions which give rise to a cause of action fall within the category of discretionary functions, a reviewing court must determine whether the plaintiff has demonstrated that such acts or omissions are in violation of clearly established statutory or constitutional rights or laws of which a reasonable person would have known or are otherwise fraudulent, malicious, or oppressive in accordance with *State v. Chase Securities, Inc.*, 188 W.Va. 356, 424 S.E.2d 591 (1992). In absence of such a showing, both the State and its officials or employees charged with such acts or omissions are immune from liability.

*A.B.*, 234 W.Va. at 497, 766 S.E.2d at 756, syl. pt. 11.

The parties disagree about whether Policy Directive 332.02 constitutes a "clearly established law" for purposes of defeating qualified immunity. While both sides set forth good arguments on this question, its resolution is unnecessary for the disposition of this appeal. Accordingly, we save the question of whether Policy Directive 332.02 is a "clearly established law" for another day.

Even assuming *arguendo* that Policy Directive 332.02 is a "clearly established law," the plaintiff must also show that it is a law "of which a reasonable person would have known." *See A.B.*, 234 W.Va. at 497, 766 S.E.2d at 756, syl. pt. 11. This "knowing" element encompasses not only the knowledge of the existence of the law, but also the knowledge that the law would apply to the particular scenario presented.

> "To prove that a clearly established right has been infringed upon, a plaintiff must do more than allege that an abstract right has been violated. Instead, the plaintiff must make a 'particularized showing' that a 'reasonable official would understand that what he is doing violated that right' or that 'in the light of preexisting law the unlawfulness' of the action was 'apparent.' *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)." *Hutchison v. City of Huntington*, 198 W.Va. 139, 149 n.11, 479 S.E.2d 649, 659 n.11 (1996).

*A.B.*, 234 W.Va. at 517, 766 S.E.2d at 776. In this case, accepting P.R.'s factual allegations as true, we cannot conclude that the information P.R. says she presented to Sergeant Dilley

one week prior to the alleged assault should have put Dilley on notice that Policy Directive 332.02 was applicable at that time.[11]

According to P.R.'s deposition testimony and subsequent affidavit, ten male inmates in the ACC recreation yard made comments about sex acts that they would like to perform on her if they "wasn't [sic] in prison." In her deposition, P.R. admitted that what the men said "wasn't really a threat." Even with the benefit of hindsight when preparing her affidavit, P.R. did not assert that she told Sergeant Dilley that she feared sexual assault, was threatened with sexual assault, or had been sexually assaulted. Rather, she averred in her affidavit that she "informed Sgt. Dilley of the sexual comments mentioned above[.]"

Policy Directive 332.02 specifies actions that DOC staff must take when an inmate reports "a sexual assault/abuse or possible sexual assault/abuse[.]" The conjoined term "sexual assault/abuse" is not defined in the policy. However, "sexual assault" is expressly defined as "sexual contact" or "intrusion."[12] The policy includes directives for preserving any physical evidence of sexual assault, such as advising the alleged victim not to shower or brush his or her teeth, and for making arrangements for the alleged victim to be examined by medical services.[13] The policy also provides directions for collecting any physical evidence of sexual assault and pursuing an investigation, including notifying the State Police.[14] After reading the policy, it is simply not obvious that it would apply to the vulgar commentary P.R. has described.

P.R. argues that Policy Directive 332.02 applies here because of the policy's use of the word "possible" in the phrase "[a]ny employee that receives a report of a sexual assault/abuse or possible sexual assault/abuse"[15] shall immediately notify the shift commander and complete an incident report. The policy does not explain what is meant by the use of the word "possible." However, the DOC contends that "possible" refers to sex

---

[11] We note that a DOC employee did complete an incident report on September 28, 2011, the same day P.R. reported she had been sexually assaulted.

[12] Section III of the policy defines "sexual assault" to mean

any sexual contact between the sex organ of one (1) person and the sex organ, mouth, or anus of another person, or any intrusion of any part of the body of one (1) person, or of any object into the sex organ, mouth, or anus of another person, by the use of force or threat of force.

[13] *See* DOC Policy Dir. 332.02 (V)(A)(3), (V)(A)(4).

[14] *See* DOC Policy Dir. 332.02 (V)(B), (V)(C).

[15] *See supra*, note 5.

10

acts that an inmate reports, but which may or may not be true. The DOC argues that this interpretation is consistent with an *in pari materia* reading of other provisions in the policy that address collecting physical evidence and pursuing an investigation. The DOC argues that there are no procedures specified in Policy Directive 332.02 for the investigation or handling of threatened future sexual assault/abuse. Having reviewed the policy language as a whole, we conclude that it is ambiguous as to whether the word "possible" means that the policy would apply to the prison yard comments P.R. has described and thereby place an employee on notice that the policy applies.

In her deposition and affidavit, P.R. describes sexual comments made to her that are, without question, abhorrent. Nonetheless, even accepting the facts she alleges as true, it is far from clear that a reasonable DOC employee would have understood that Policy Directive 332.02 was triggered when P.R. reported these comments to Sergeant Dilley. At best, when reading the policy as a whole, the use of the word "possible" creates an ambiguity. As such, an official in Sergeant Dilley's position could not be expected to understand that failing to implement Policy Directive 332.02 in that situation would be violative of P.R.'s rights. *See A.B.*, 234 W.Va. at 517, 766 S.E.2d at 776. Put another way, under these circumstances, the "unlawfulness" of failing to follow the policy directive would not be "apparent." *Id.*

When Policy Directive 332.02 is removed from the analysis, P.R. is left with her general claims against the defendants of negligent staffing and negligent supervision of staff and inmates on the day of the alleged assault. However, her general negligence claims do not defeat the broad scope of qualified immunity. Our law is clear that the doctrine of qualified immunity bars claims of mere negligence. *See e.g., Clark*, 195 W.Va. at 274, 465 S.E.2d at 376, syl. pt. 6. Simply making "the skeletal assertion that if . . . [a correctional officer] were properly trained and supervised, the rape would not have occurred" is nothing more than an "illusory and languid contention . . . [not] sufficient to overcome the State's immunity[.]" *A.B.*, 234 W.Va. at 516 n.33, 766 S.E.2d at 775, n.33. This footnote in *A.B.* cites *West Virginia Department of Health and Human Resources v. Payne*, 231 W.Va. 563, 574, 746 S.E.2d 554, 565 (2013), where this Court rejected an argument that qualified immunity is lost simply because state agency defendants did not do their jobs properly. Accordingly, we conclude that the DOC, Warden Patterson, and Associate Warden Walton have qualified immunity to P.R.'s negligence claims. It was error for the circuit court to have denied their motion for summary judgment on this basis.[16]

---

[16] Additionally, P.R. makes a very limited alternative argument in her response brief that qualified immunity is defeated because the DOC, Warden Patterson, and Associate Warden Walton committed acts or omissions against her that were "fraudulent, malicious or oppressive[.]" *See A.B.*, 234 W.Va. at 497, 766 S.E.2d at 756, syl. pt. 11. Citing to dictionary definitions of these terms, she argues that these defendants acted fraudulently, maliciously, or oppressively by failing to "properly staff ACC and [failing to] adequately

To be clear, this Court does not condone sexual assault or the vulgar comments described by P.R. However, we are duty-bound to follow the law of qualified immunity. For the foregoing reasons, we reverse the circuit court's ruling regarding the application of qualified immunity to P.R.'s negligence claim. This case is remanded to the circuit court for the entry of an order granting summary judgment for the defendants.

Reversed and Remanded

**ISSUED:**

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison

**DISSENTING AND WRITING SEPARATELY:**
Justice Margaret L. Workman

WORKMAN, J., dissenting:

I dissent from the majority's opinion in this case because the decision to grant immunity to the petitioners is at best premature, and at worst an unwarranted and unwise expansion of the law set forth in this Court's immunity decisions. In an oft-repeated formulation, the United States Supreme Court wrote that the law seeks to balance "two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In my view, this Court has lost its balance; in our laser focus on shielding public officials, we are minimizing the harm done to victims,[1] especially those victims

---

investigate or even address [P.R.'s] cry for help prior to the gang rape." However, because it is undisputed that Sergeant Dilley never reported P.R.'s complaint about the prison yard sexual comments (assuming *arguendo* that such complaint was in fact made to Dilley), it is unclear how the DOC and the two wardens would have known of the alleged "cry for help" or the need to investigate and address the same. As such, we find no merit to this argument.

[1] In this regard, the majority dutifully recites the conclusion reached by the DOC's internal investigation: "due to conflicting statements of the victim and the accused, and no known independent witnesses or physical evidence, the accusation . . . is unsubstantiated." I believe that it is a disputed issue of material fact as to whether this investigation may have

most powerless to protect themselves – prison inmates who are the victims of sexual assault.

I begin by referencing two important points with respect to our standard of review, both of which the majority honors in the breach rather than in the observance. First, questions of statutory or qualified immunity are properly determined on summary disposition "unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination." Syl. Pt. 1, in part, *Hutchison v. City of Huntington,* 198 W.Va. 139, 479 S.E.2d 649 (1996); Syl.. Pt. 3, in part, *W. Va. Reg'l Jail Corr. Facility v. A.B.*, .234 W. Va. 492, 766 S.E.2d 751, 755 (2014). Second, because our review of the grant or denial of summary judgment is plenary, "this Court, like the circuit court, must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Asaad v. Res-Care, Inc*., 197 W. Va. 684, 687, 478 S.E.2d 357, 360 (1996). In its analysis of whether the petitioners are entitled to qualified immunity, I believe that the majority has completely ignored these limiting principles of appellate review and engaged in a rush to judgment.

In its opinion, the majority has done a masterful job in threading the proverbial needle by avoiding the substantive issue argued by the parties – whether the DOC's Policy Directive 332.02 ("Policy Directive") constitutes a "clearly established law" for purposes of defeating qualified immunity – by holding that even assuming arguendo the Policy Directive is *clearly established,* nonetheless it isn't *clear*.[2] Therefore, according to the majority, the Court is "duty bound" to grant qualified immunity to the petitioners because "an official in Sergeant Dilley's position could not be expected to understand that failing to implement Policy Directive 332.02 in that situation would be violative of P.R.'s rights." Under the facts and circumstances of this case, I cannot agree with this crabbed interpretation of what a correctional officer in Sergeant Dilley's position could be expected to understand.

The Anthony Correctional Center houses both male and female inmates, young offenders between the ages of eighteen and twenty-five years, a circumstance which in and of itself presents particular challenges for officials in charge of the institution. According to the respondent, the supervision of large numbers of inmates in the recreation

---

been pro forma; in light of the respondent's accusation that correctional officers failed to protect her, the Division of Corrections had its own institutional interests to protect as well as the respondent's interests.

[2] One may reasonably question why the DOC needs a written Policy Directive to establish that allegations of sexual assault, and/or the threat of sexual assault, should be investigated, and that steps should be taken to protect inmates from all forms of violence, including sexual assault.

yard is minimal at best, which increases the opportunity for exactly the sort of incident which allegedly took place in this case: a brutal gang rape in the women's outdoor bathroom facility. Yet when the respondent reported to Sergeant Dilley that a large group of male inmates had made disgusting, vulgar and intimidating sexual threats to her, he allegedly asked no questions and took no action whatsoever. In the single Syllabus Point in *Bennett v. Coffman*, 178 W. Va. 500, 361 S.E.2d 465 (1987), this Court held in relevant part that "[g]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a *reasonable* person would have known." (Emphasis supplied.)

I simply cannot accept the majority's blithe conclusion that a *reasonable* officer in Sergeant Dilley's position would fail to understand that the respondent was in danger, and I further do not accept that whether or not to take some action to protect her - any action at all - was a discretionary call on the officer's part. If the protection of inmates from violence and sexual assault is discretionary, then a sentence of imprisonment in this State should carry with it the words appearing at the threshold of Hell: Abandon hope, all ye who enter here.[3]

As noted earlier, because our review of the grant or denial of summary judgment is plenary, "this Court, like the circuit court, must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Asaad,* 197 W. Va. at 687, 478 S.E.2d at 360. The majority has utterly failed to follow this longstanding rule of appellate review in the instant case. The respondent alleges that she was brutally gang-raped, vaginally and anally, by three individuals who had earlier been part of a larger group that made crude and vulgar sexual comments to her, comments which a jury could easily conclude were threats of imminent sexual violence. Further, the respondent alleges that she reported these threats to Sergeant Dilley, who did absolutely nothing. Further, the respondent alleges that "[s]ince the opening of ACC, there has existed a continuing practice and pattern of sexual harassment, sexual abuse, sexual assault and rape visited upon inmates." At this stage of the proceedings, we are obliged to view these allegations as true and to accept the inference the respondent would have us draw therefrom: that her rape was the direct and proximate result both of the petitioners' longstanding failure to protect inmates, as well as Sergeant Dilley's unreasonable failure to appreciate the danger to the respondent and to report the issue "up the ladder" or at least do *something* to protect her after she reported being threatened. The circuit court denied summary judgment on the ground that there were disputed issues of material fact with respect to the respondent's claims and the petitioners' defenses, and the court was clearly correct in this assessment.

---

[3] Dante Alighieri, *Divine Comedy, Part* I (*Inferno*), Canto III (1320).

Rather than confront these allegations in a straightforward manner, and through a prism of common sense, the majority spends its time engaging in a discussion of whether "possible sexual assault/abuse" could be interpreted by a reasonable corrections officer to encompass the *threat* of sexual assault, where a young female inmate reports disgusting and threatening sexual comments made to her by a large gang of male prisoners. Although I suppose that "possible sexual assault/abuse" could have different meanings in different contexts, the petitioners' argument that it means "rape-but-we-don't-really-believe-it" is frankly absurd. It is particularly absurd in the instant case, where the petitioners' initial institutional position, upon receiving the respondent's report of a vaginal and anal gang rape, which occurred on a concrete bathroom floor, was that this could very well have been a consensual encounter. Circuit judges instruct juries every day that they should not leave their common sense outside the door when they enter the jury room, and I suggest that the petitioners' strained arguments would not pass the common sense test in any courtroom in this State.

In this Court's qualified immunity jurisprudence, one precedent frequently cited is *Regional Jail and Correctional Facility Authority v A.B.*, 234 W. Va. 492, 766 S.E.2d 751 (2014), the first of several opinions in which we held that jail or prison officials were immune from liability for inmate rape, even where the rapist was a jail or prison official. *See R.Q. v. W. Va. Div. of Corr.*, No. 13-1223, 2015 WL 17463 (W. Va. Apr. 10, 2015) (memorandum decision); *E.B. v. W. Va. Reg. Jail,* No. 16-0092, 2017 WL 383779 (W. Va. Jan. 27, 2017) (memorandum decision). As the author of the dissenting opinion cogently observed in *A.B.*, "'[w]isdom too often never comes, and so one ought not to reject it merely because it comes late.'" 234 W. Va. at 519, 766 S.E.2d at 778 (Davis, J., dissenting) (internal citations omitted). The wisdom to which then-Justice Davis referred was the wisdom to understand that the real issue in that case was not whether the correctional officer in question was acting outside the scope of his employment when he raped a jail inmate on multiple occasions, but rather "what the Regional Jail did to assure the reasonable safety of the plaintiff *from being raped*." *Id.* at 520, 766 S.E.2d at 779.

As the author of the majority opinion in *A.B.*, I believe that the decision in that case was and is consistent with the law as it has been developed by this Court over the past decades. However, I have come, albeit reluctantly and late, to the realization that then-Justice Davis was right in *A.B.* when she pointed out "the reality of the injustice [the Court] has unleashed[,]" *id.*, in that we have focused so intently on the rights of governmental agencies, officers and employees to be shielded from liability for their tortious acts that we have lost sight of the rights of their victims. At a minimum, in the cases involving jail or prison inmates, those rights include the right, to the extent reasonably possible, "to be free 'from invasion of [their] personal security though sexual abuse.'" *Id.* at 521, 766 S.E.2d at 780 (citing *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3rd Cir. 1989)). No crime, and no circumstance, justifies our indifference to institutional rape. *Cf. De'Lonta v. Clarke*, No. 7:11-cv-00483, 2013 WL 209489, at *3 (W.D. Va., Jan. 14, 2013) ("Being violently assaulted in prison is simply not part of the penalty that criminal

15

offenders pay for their offenses against society.") (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Inasmuch as every inmate in West Virginia is in an institution pursuant to a court order, I suggest that the Judicial Branch has a responsibility, through rigorous review of the cases before us and scrupulous application of the law, to ensure that the Executive Branch is in turn fulfilling its responsibility to protect the individuals in its charge. We must be willing to hold officials accountable in a case where the facts demand it, even where the individual bringing the lawsuit is something less than an ideal plaintiff.

Other jurisdictions have held that there is a duty on the part of prison officials to protect inmates from inmate-on-inmate violence; it is not a discretionary function. *E.g., Sanchez v. State of N.Y.*,784 N.E.2d 675 (2002) ("having assumed physical custody of inmates who cannot protect and defend themselves in the same way those at liberty can, the State owes a duty of care to safeguard inmates even from attacks by fellow inmates."); *Mattox v. State Dep't of Corr.*, 323 P.3d 23, 26 (Alaska 2014) ("The Department of Corrections owes a duty to inmates to exercise reasonable care for the protection of their lives and health"). Although this Court has expressed agreement with what seems an unremarkable concept,[4] the expanding concept of immunity for correctional officials has so far overtaken their duty to protect inmates that the duty has largely become unenforceable. I believe that we need to make a diligent effort to find the balance between immunity and duty enunciated in *Pearson,* and this case would be a good place to start: whether or not Sergeant Dilley's failure to act was reasonable is not beyond dispute and does not hinge on a single word in Policy Directive 332.02, as the majority has held. *See Pearson*, 555 U.S. at 231.

In *De'Lonta*, Senior District Judge James C. Turk wrote that "'the shield that qualified immunity provides is limited to those officials who are either unaware of the risk or who take reasonable measures to counter it,'" 2013 WL 209489 at *5 (citing *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000)). Further, "the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault, and no reasonable prison guard could possibly have believed otherwise." *Id.* (citing *Turner v. Huibregise*, 421 F.Supp.2d 1149, 1152-53 (W.D. Wis. 2006)). Although *De'Lonta* involved a sexual assault on a prisoner by a corrections officer, its rationale is directly on point where, as here, only by a feat of linguistic legerdemain could it be said that Sergeant Dilley was not aware of the risk to the respondent posed by sexually aggressive male prisoners telling her that they "wanted to fuck that phat

---

[4] *See* Syl. Pt. 2, in part, *Hackl v. Dale*, 171 W. Va. 415, 299 S.E.2d 26 (1982) ("A prisoner has a right, secured by the Eighth and Fourteenth Amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates[.]").

ass."[5] Further, only by narrowing the facts of this tragic case down to the interpretation of one single word, "possible," could it be said that under the facts and circumstances of this case, Sergeant Dilley could reasonably have concluded that he didn't need to say or do anything to protect the respondent.

Over the years, several Justices of the United States Supreme Court have expressed reservations with respect to the qualified immunity doctrine, albeit on differing grounds. As described by Professor Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1798-99 (2018),

> [b]ut there are also cracks in qualified immunity's armor. Most recently, in his concurrence in *Ziglar v. Abbasi*, *[*137 S. Ct. 1843 (2017)*]* Justice Thomas criticized the doctrine for bearing little resemblance to the common law at the time the Civil Rights Act of 1871 became law, and for being defined by "precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Indeed, Justice Thomas recommended that "[i]n an appropriate case, we should reconsider our qualified immunity jurisprudence." Much attention has been paid to Justice Thomas's call to reconsider qualified immunity doctrine in *Ziglar*. But Justices have been raising questions about qualified immunity for decades. In 1997, Justice Breyer suggested that defendants should not be protected by qualified immunity if they are certain to be shielded from financial liability by their employer. In 1992, Justice Kennedy indicated that qualified immunity doctrine might be unnecessary to shield government defendants from trial given the Court's summary judgment jurisprudence. In 2015, and again in 2018, Justice Sotomayor expressed concern that the Court's qualified immunity decisions contribute to a culture of police violence.

(Internal footnotes omitted.) Legal scholars and commentators have likewise begun to question the efficacy of the doctrine as well as its fundamental fairness. *See, e.g.*, Note, *Rebalancing Harlow: A New Approach to Qualified Immunity in the Fourth Amendment*, 68 Chase W. Res. L. R. 495 (2017); William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018); Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019). Common problems and issues raised include:

---

[5] This and other distinctly threatening comments were set forth in the respondent's affidavit submitted in response to the petitioners' motion for summary judgment.

Courts straining to find precedent that is squarely on point factually, in order to establish whether or not a right is clearly established, has resulted in the "conver[sion of] qualified immunity to near absolute immunity," *Rebalancing Harlow: A New Approach to Qualified Immunity in the Fourth Amendment*, 68 Chase W. Res. L. R. at 519;

Asking a court to decide what a reasonable official would have believed to be legal requires the court to do inappropriate fact-finding and to personalize the inquiry by putting itself in the shoes of the official, *id*. at 520;

Courts "skip straight to the clearly established prong" of the qualified immunity analysis, with the result that analysis of the merits of the plaintiff's claim fall by the wayside, *id*. at 521-22; and

The focus on whether an official's conduct is objectively reasonable will, in many cases, "trump[] intentional wrongdoing," *id*. at 523.

The opinion in the instant case illustrates all of these concerns. By limiting its discussion of clearly established rights to Policy Directive 332.02, and thereafter to the single phrase "possible sexual assault/abuse," the majority has completely sidestepped any discussion of whether the respondent's right to physical safety, and bodily integrity, was a clearly established right of which any reasonable correctional officer should have been aware. By putting itself into Sergeant Dilley's shoes in order to decide what he would reasonably have understood to be his duties under the Policy Directive, the majority then engaged in unwarranted fact-finding and usurped the province of a jury. Without question, the merits of this dispute have fallen by the wayside in the majority's rush to judgment; what led up to the respondent's rape, the details of this horrific experience, and what happened to the respondent afterwards – we can only wonder, because the only thing important to the majority's decision was what was going on in Sergeant Dilley's head. Finally, whether Sergeant Dilley was simply negligent, or whether he was callously indifferent to the respondent's safety, will never be known, because the majority utilized only an objective standard of reasonableness.

In this dissent, it is not my intent to write a treatise on the doctrine of qualified immunity or to castigate the majority, although I am firmly convinced that this case has been wrongly decided. Instead, it is my intent to spark a conversation about the doctrine of qualified immunity,[6] whose development over the years has led us to what we are doing

---

[6] During my thirty years of judicial service, I have tried to faithfully follow the law even when I personally do not agree with it. This does not mean, however, that the law must forever remain static. In a proper case, it is the duty and function of an appellate court to determine whether the law should evolve – usually in baby steps – in order to adapt to changing circumstances and new challenges.

today: slamming the door of the courthouse in the face of a powerless individual who was sexually assaulted, on the ground that the people whose duty it is to protect her could not reasonably have known they should do something in a situation replete with red flags.  Our immunity jurisprudence in the area of inmate sexual assault has come to this: if a correctional officer rapes an inmate, the Division of Corrections is immune because raping inmates is not within the scope of the officer's duties; and if an inmate rapes another inmate, the Division of Corrections is immune because correctional officers cannot reasonably be expected to understand that they have a duty to protect inmates from violence and sexual assault.  The bottom line is that the law as it currently stands does not protect inmates from sexual assault perpetrated by *anyone* – guard or inmate - in a penal institution.

I am not under any illusions that this dissent will change any of my colleagues' minds in the instant case; nonetheless, it is the duty of an appellate court judge to articulate his or her separate reasoning, either in a concurrence or a dissent, when such separate reasoning may have some effect, someday, in the development of the law. In this regard, "[a]ppellate courts have two primary purposes, and the standard of review to be applied by appellate courts should relate to those two purposes.  Appellate courts should serve to develop the law in a particular area as guidance for future cases and to rectify egregious errors in particular cases."  Christopher M. Pietruszkiewicz, *Economic Substance and the Standard of Review*, 60 Ala. L.Rev. 339, 360 (2009).

In summary, the circuit court was correct in its determination that disputed issues of material fact exist in this case, and that summary judgment for the petitioners on immunity grounds inappropriate, at least at this time.  The respondent should have been permitted to proceed with her case at trial, and to hold the petitioners accountable if the jury found the allegations in the complaint to be true.

Accordingly, I dissent.